RALPH C. MASON and CAMPBELL LOCKE, as Executors, etc., of EILA HAGGIN McKEE, Deceased, Respondents, v. THE PUBLIC NATIONAL BANK & TRUST COMPANY OF NEW YORK, Appellant.

First Department, June 18, 1941.

*Joseph M. Proskauer* of counsel [*Sam L. Cohen, Alfred W. Bressler, Eugene Eisenmann* and *Henry Schneider* with him on the brief; *Moses & Singer*, attorneys], for the appellant.

*Clifton P. Williamson* of counsel [*Donald M. Dunn* and *Clyde W. Sorrell* with him on the brief; *Alexander & Green*, attorneys], for the respondents.

*F. W. H. Adams* of counsel [*John C. Morrissey* with him on the brief; *Dorsey, Adams & Walker*, attorneys], for New York State Bankers Association, as *amicus curiæ*.

CALLAHAN, J. Plaintiffs are the executors of the will of Eila Haggin McKee, who died in 1936. The testatrix at the time of her death was the owner of two blocks of stock of the Homestake Mining Company. One of these blocks of stock, consisting of 1,000 shares, was placed in the hands of Richard Whitney & Co. (members of the New York Stock Exchange) by the plaintiffs for the purpose of sale. Three hundred shares were sold and the remaining 700 shares were converted into 5,600 shares upon a

change in par value by the company. When the new stock certificates were issued, plaintiffs caused them to be registered in the name of Richard Whitney & Co. and permitted them to remain in the custody of that firm. The purpose of so registering the stock was to avoid difficulties which might otherwise arise concerning transfer of title when stock is registered in the name of executors. It is conceded that thus placing stock in the name of brokers is a common practice. It is known as registering stock in a street name.

On January 26, 1938, Richard Whitney, a member of the firm of Richard Whitney & Co., called on the president of defendant bank and negotiated two personal loans. He offered certain collateral to secure said loans, and the bank agreed that upon the delivery of this collateral it would lend the money requested. Included in the collateral which Whitney advised the bank he would deliver were 5,600 shares of Homestake Mining Company stock.

Following the usual routine in the completion of loans, a messenger representing Whitney presented to defendant bank later on the day above mentioned, fifty-six certificates in identical form, each calling for 100 shares of Homestake Mining stock. The clerk had already received an office memorandum stating that the loan was to be made on such collateral. All of the fifty-six certificates of Homestake stock so tendered were registered in the name of Richard H. Whitney & Co. and were indorsed in blank in the name of that firm and by a person duly authorized to make such indorsement other than Richard Whitney. These indorsements were dated six months prior to the tender of the stock as a pledge, and were in due form in accordance with the requirements of the New York Stock Exchange for delivery of street certificates.

A street certificate is a stock certificate which has been issued in the name of a firm having a membership on the New York Stock Exchange which is indorsed in blank with the authorized signature of such firm, duly witnessed.

The clerk who received the Homestake stock was employed in a department of the bank maintained for the purpose of receiving collateral on loans. This department completed a great many such transactions every day, frequently receiving securities aggregating more than $5,000,000 daily. One clerk testified that he handled as many as 1,569 stock certificates in a day.

The usual course in making an examination to determine whether the stock is in " good order " for delivery is to examine the face of the stock to determine in whose 'name it is registered, and if registered in other than the name of the borrower, to examine the reverse side of the certificate to see whether it is properly indorsed.

Pursuant to that custom the clerk examined both the face and the reverse side of the Homestake certificates and saw that they were indorsed in blank by a person duly authorized to sign the name of the registered holder, which was a New York Stock Exchange firm. Finding it was so indorsed, he accepted the certificates as collateral for the loan to Whitney.

Thereafter, and prior to the failure of the firm of Richard Whitney & Co., which occurred on March 8, 1938, 3,600 shares of the Homestake stock had been returned by the bank in connection with part payments of the loan. This left 2,000 shares of Homestake stock on deposit with the bank at the time of the failure.

The defendant bank has been held liable for converting these 2,000 shares of stock, and plaintiffs have obtained a judgment in the sum of $125,250, with interest, by reason thereof. The theory on which the defendant has been held liable for conversion is that it was under a duty to make an inquiry as to the true ownership of the Homestake stock presented to it in the street name of Richard Whitney & Co., because Whitney was submitting said stock as collateral for a personal loan.

It thus will be seen that the trial court applied to the transactions involved herein relating to transfer of securities the rule applicable in transactions wherein third persons take corporate or partnership checks, or other negotiable paper in payment of the personal debt of a corporate officer or of a member of a partnership.

We hold that the application of this rule of law to the facts in this case was error. We do so for two reasons: *First,* the facts in this case do not justify placing upon the defendant bank the duty of inquiry with respect to the authority of Whitney to use this collateral as security for the loan, and, therefore, the defendant bank took the securities in good faith. *Second,* if the duty of inquiry was present, a reasonable inquiry would have disclosed that Whitney was authorized to pledge these securities in so far as any member of the firm of Richard Whitney & Co. knew. We base our rulings upon the facts, most of which are undisputed and many of which were found by the trial court.

Among the findings of fact made by the trial court were several to the effect that the term " street certificate " is a common term generally known in the financial district of New York city; that street certificates, when properly indorsed and witnessed, pass by delivery between banks, brokers and financial houses as a matter of usual custom whenever title is to be transferred to such certificates, and that all the certificates of stock received as collateral by the defendant bank from Richard Whitney on January 26, 1938, were street certificates. The trial court further found that members

of New York Stock Exchange firms frequently permit securities which they own individually and in which their firms have no interest, to be used by such firms as collateral for loans to the firm. The foregoing findings were amply supported by the evidence.

The evidence here also discloses that between September, 1936, when plaintiffs employed Richard Whitney & Co. as brokers, and February 16, 1937, the Homestake stock involved herein was carried on the books of the brokers as the property of the estate of Eila Haggin McKee; that on February 16, 1937, an entry was made on Richard Whitney & Co.'s books that this stock had been " delivered out," which entry ordinarily meant delivery to the customer who owned the stock.

The books also disclose that from February 16, 1937, to January 26, 1938, the Homestake stock was carried in an account known as the Richard Whitney Control Account. The control account contained no notation that any of the shares therein were received from, or ever had been the property of, the plaintiffs or their testatrix.

Richard Whitney was the dominating partner of Richard Whitney & Co. He personally handled plaintiff's business with his firm. He had sole control of the finances of Richard Whitney & Co. and arranged all loans and other financial matters for the firm. The other members of the partnership, other than one Rodewald, were either engaged on stock exchanges or in other work which required their absence from the office. Rodewald was the office partner of the firm and in charge thereof in Whitney's absence. Although Rodewald testified that he had no personal knowledge as to who was the actual owner of the stock in the Richard Whitney Control Account, all of the proof in the case indicates that the securities in that account were on January 26, 1938, recognized by the employees and members of the firm of Richard Whitney & Co. to be the property of Richard Whitney. Two annual balance sheet audits of the firm's books made in the years 1937 and 1938 showed that these securities in the control account were Richard Whitney's securities. The result of this listing was to give credit in these audits for said securities as property owned by one of the partners. It also appears that the stock in the control account had been pledged frequently for firm loans with banks other than defendant. These and other circumstances show that the members of the partnership recognized the stock in the control account as that of Richard Whitney, or as property over which he had complete dominion.

In adjudging the defendant liable, the trial court held that the circumstances of the form of the certificates made it incumbent

upon the defendant bank to inquire whether Richard Whitney & Co. had any interest in the certificates, and that the fact that the certificates were in the name of Richard Whitney & Co. and were tendered by an individual member of that firm for a personal loan, cast a shadow upon their negotiability. It held that since no inquiry had been made by the bank, it was chargeable with such facts as a reasonable inquiry would have disclosed. The court found that such an inquiry would have led the defendant to inquire of some member of the firm of Richard Whitney & Co., other than Whitney himself, as to whether Whitney had authority to pledge the securities. It further held that such an inquiry would have shown that Whitney did not possess such authority. Based on this reasoning the trial court found that the failure to inquire established *prima facie* that the collateral had been taken in bad faith.

It thus will be seen that the plaintiffs have recovered judgment against the bank under a rule of law which ordinarily is applied to give protection to a principal against derelictions of its agents, although in this case Whitney's principal, Richard Whitney & Co., did not own the stock pledged and could assert no claim of diversion.

The law applied by the trial court is based upon the well-settled principle that when a person has had a transaction with a partner, which is neither apparently nor really within the scope of the partnership business, the partnership is not bound by the member's declarations, because in such a case a third person has notice that the transaction is outside the scope of partnership affairs. (*Cheever* v. *Pittsburgh, etc., R. R. Co.*, 150 N. Y. 59; *Union National Bank* v. *Underhill*, 102 id. 336.)

This rule of inquiry was indicated in the case of *Rochester & C. T. R. Co.* v. *Paviour* (164 N. Y. 281, 284) in the following language describing the duty of the recipient of such paper: " While he was not bound to be on the watch for facts which would put a very cautious man on his guard, he was bound to act in good faith. [Citing cases.] Even if his actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith and the law will withhold from him the protection that it would otherwise extend."

The basic premise upon which the rule of inquiry propounded in the case cited rests, is that knowledge of facts indicating a diversion of the principal's property is given when one receives from an agent what appears to be the property of the principal in payment of the agent's debt. Sufficient notice of suspicious facts that require inquiry in relation to the right to use the principal's funds is said to arise from the agent's use of corporate or partnership checks.

In the present transaction we have an entirely different set of circumstances from the use of a corporate or partnership check for the payment of an agent's debt. We have a case treating with the transfer of corporate securities and not the payment of corporate funds by an agent. The law concerning the transfer of corporate securities is found in the Uniform Stock Transfer Act (Pers. Prop. Law, §§ 162–185). This statute provides that title to a certificate may be transferred by delivery of the certificate indorsed in blank (§ 162). It further provides that delivery of a certificate to transfer title in accordance with the provisions of section 162 will be effectual, except as provided in section 168 (Pers. Prop. Law, § 166). Section 168 of the statute provides that " If the delivery of a certificate was made (c) Without authority from the owner * * * the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless: 1. The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful * * *."

Section 183, subdivision 2, of the act provides that a thing is done in " good faith " within the meaning of the act " when it is in fact done honestly, whether it be done negligently or not."

It will thus be seen that the Uniform Stock Transfer Act makes valid transfers of stock certificates indorsed in blank, even though such transfers are without the authority of the actual owner, unless there is bad faith on the part of the transferee of such certificates or failure by him to take cognizance of circumstances giving notice that the transfer was wrongful. Under the statute the test of good faith is common honesty and not the degree of care exercised. It is to be further noted that the Uniform Stock Transfer Act does not define what notice permits reclamation, except to say that it is to be notice of facts making a transfer wrongful. We take this to mean that a transferee would be required to have objective evidence indicating a proposed wrongful transfer. If such evidence exists, of course, a transferee cannot refuse to take cognizance of it, but no requirement of inquiry seems to be imposed on such transferee unless such evidence is present.

There is no claim by the plaintiffs in this case that defendant's clerk did not act honestly in accepting the Homestake certificates. Plaintiffs' claim is that defendant had notice of facts which made the transfer wrongful, in that the form of the certificates conveyed notice of a diversion by Richard Whitney of stock belonging to Richard Whitney & Co. It is this circumstance which plaintiffs claim puts the duty of inquiry on defendant.

The thing actually wrongful in the transaction involved herein was that plaintiffs' property was being used for a pledge which

they had not authorized. While plaintiffs had placed the stock in the possession of Richard Whitney & Co. and had caused the certificates to be issued in the firm's name, and thus had made the indorsement in blank possible, it did not authorize the use of the stock except in delivery upon an actual sale. But there was nothing about the form of the certificates which indicated plaintiffs' ownership of the stock in question or wrongful diversion of plaintiffs' property. Nor do we think that the circumstances gave ground to suspect a wrongful diversion of property of plaintiffs' broker, Richard Whitney & Co. Therefore, even if we assume that the same rules of law applicable to the acceptance of corporate or partnership checks from a corporate officer or partner would apply to the transfer of stock certificates delivered after indorsement in blank, we fail to see how such rule would impose liability under the facts present herein. The circumstance that Richard Whitney claimed to be the owner or to have the right to pledge the stock last registered in the name of his firm, would arouse no suspicion, because of the rights afforded the bearer of stock in a street name, indorsed in blank. It was quite possible that Richard Whitney would have stock which he owned registered in the street name of his firm, the same as did the plaintiffs, or as might any other owner of such stock. Again, Whitney may have come into possession of the certificates involved by transfer from a purchaser in a valid transaction. The indorsement in blank was six months old and there was no necessity of further registration each time a transfer was made. It is plain, therefore, that the application of the rule of inquiry in the present case fails to give proper effect to the circumstances existing in connection with the present pledge.

A proper conclusion of law, based upon the form of the certificates presented, would have been that being in a street name and properly indorsed they conveyed no notice of continued ownership in the firm of Richard Whitney & Co., but, on the contrary, indicated that the right existed to transfer title by delivery by any holder thereof. To impose any other rule would be to ignore common business practice. It would run counter to the purpose of the Uniform Stock Transfer Act which plainly seeks to supply elements of negotiability to certificates of corporate stock which had been lacking at common law. (See *Turnbull* v. *Longacre Bank*, 249 N. Y. 159.) Under the statute, since the certificates of stock had been indorsed by plaintiffs to Richard Whitney & Co. and validly indorsed by that firm, good title passed to the defendant bank, despite the fact that the delivery was unauthorized by the actual owner. (*Turnbull* v. *Longacre Bank,* supra; *Van Schaick* v. *National City Bank of N. Y.*, 245 App. Div. 525; affd., 271

N. Y. 570; *Commercial National Bank* v. *National Surety Co.*, 259 id. 181.) Stock certificates issued in the name of a stock exchange firm do not import ownership by that firm, at least after valid indorsement, since they are customarily placed in street names merely for the convenience of transfer. (*Cleminshaw* v. *Meehan*, 236 App. Div. 185.)

The practice of delivering certificates indorsed in blank in connection with change of title without change in registration is stated in *Fisher* v. *Mechanics & Metals National Bank* (89 Misc. 587, 594), as follows: " It is common knowledge that certificates of stock standing in the name of an original owner and indorsed in blank are dealt in thousands of times, and during a period, often of many years, without change of name of the original owner, although title has changed on innumerable occasions."

The very purpose of rules making certificates negotiable when indorsed in blank is to enable all persons to treat possession of the certificates as equivalent to ownership. (Meyers on the Law of Stock Brokers and Stock Exchanges, pp. 520, 521.) It will be seen, therefore, that the transfer of a certificate of stock, duly indorsed in blank, differs materially from a transaction involving the use of corporate checks by an officer thereof to pay personal debts. The issuance of the latter class of instruments immediately gives notice that money of the principal is being diverted by his agent and requires inquiry. The element of notice in such a transaction rests on the basic premise that a corporate agent or partner has neither implied nor apparent authority to use corporate or partnership property for such purpose. Hence, as the attempted transfer is without actual authority, it constitutes a conversion. (*Wen Kroy R. Co.* v. *Public National Bank & T. Co.*, 260 N. Y. 84.) To say that a street certificate, indorsed in blank, which ordinarily passes from hand to hand without further indorsement and, hence, does not indicate who was the last preceding owner, gives notice to a transferee of a diversion of the property of the last indorser, ignores the entire history of business experience concerning the delivery of such certificates. We deem that a holding of this sort would actually hamper the negotiability of such instruments and interfere with the customary dispatch of business. Under the circumstances the rule of inquiry should not be extended to the present situation where the facts were as consistent with ownership by the partner or agent himself as with any other inference.

Our second reason for reversing the judgment is that we think that the evidence establishes (even if the bank could be said to be under any duty of inquiry) that a reasonable inquiry would have disclosed that Whitney was authorized to pledge the securities

in so far as any member of the firm of Richard Whitney & Co. knew.

In *Ward* v. *City Trust Co.* (192 N. Y. 61) it was held that good title passed where reasonable inquiry would have revealed the appearance of authority, even if the fact were otherwise. The rule was stated to be that if no inquiry was in fact made to dispel the presumption of diversion, but reasonable inquiry would have led to the discovery of facts which would have dispelled such presumption, the purchaser of the paper would be entitled to the benefit of such facts as he would have learned upon proper investigation, but would be charged with the burden of responsibility for such unfavorable facts as reasonable inquiry would have revealed.

Whether defendant in this case would be relieved under the rule last mentioned would depend upon what would be considered the scope of a reasonable inquiry. The trial court found that the proper person to whom inquiry by the bank should be addressed would be a partner of Richard Whitney & Co. other than Richard Whitney. We agree with this view. We find, however, that if such an inquiry had been made, it would quite probably have been addressed to Mr. Rodewald, the office manager of the firm. An inquiry so made would reveal that Whitney apparently owned the stock pledged, for it was in the control account, known as his personal account, and had been so listed in statements rendered by the firm. Rodewald did not know in fact that the shares of Homestake Mining stock in the control account were owned by the McKee estate. He knew that his firm had been selling Homestake stock for the estate, but most of these transactions were completed by making deliveries from a block of stock held by other fiduciaries. Therefore, to say, as did the trial court, that if an examination had been made of the books relating to transactions had in the year 1937, this might have led to the discovery that the same stock which had been taken from the closed McKee account had found its way into the Richard Whitney Control Account, would, we think, be imposing a far greater duty of inquiry than would be reasonable under the circumstances. There can be no doubt that Rodewald believed that the stock in question belonged to Whitney or that he was authorized to pledge the same, for the books of the firm show that the stock had been frequently so used in connection with prior pledges for the firm's account.

Even under plaintiffs' contention, there was nothing to suggest ownership of this stock by any person other than Whitney, unless it might be said that the fact that it was issued to Richard Whitney & Co. placed upon the bank the duty of inquiry as to whether Richard Whitney & Co.'s property was being diverted. The only

question, therefore, which the bank would have been required to ask of Rodewald, if the duty of inquiry arose, was whether Whitney owned or had authority to pledge the stock as against the partnership. Rodewald knew that the stock did not belong to the partnership, and he had no knowledge of the fact that it was owned by the plaintiffs. Even if inquiry was called for, to base liability on facts that could only have been revealed by a painstaking audit of Richard Whitney & Co.'s books, would be imposing a burden on the defendant bank wholly unwarranted in law.

In the light of our determination concerning the matters above referred to, we see no necessity of discussing the other questions raised by the briefs.

The judgment appealed from should be reversed, with costs, and judgment directed in favor of defendant, with costs.

MARTIN, P. J., UNTERMYER, DORE and COHN, JJ., concur.

Judgment unanimously reversed, with costs, and judgment directed in favor of the defendant, with costs. Settle order on notice reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.