TWINLOCK, INC., a corporation of the State of Delaware, Appellant,

*vs.*

CONTINENTAL THRIFT, a corporation of the State of California, Appellee.

*Supreme Court, On Appeal, February 7, 1961.*

*Ernest S. Wilson, Jr.*, of Morford, Young & Conaway, Wilmington, for appellant.

*Louis J. Finger* of Richards, Layton & Finger, Wilmington, for appellee.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: Continental Thrift, a banking corporation of the State of California, filed suit to compel Twinlock, Inc., a Delaware corporation, to issue to it a certificate evidencing Continental's ownership of 32,000 shares of Twinlock's stock. These shares had been pledged with Continental by James G. Fuller in October 1957 as security for a loan to him of $41,000 by Continental. In August 1958 Continental acquired the stock by foreclosure of the pledge. Continental forwarded the certificates to Twinlock and demanded the issuance to it of a certificate evidencing its ownership. Twinlock refused and Continental brought suit. Twinlock contended that the shares had been illegally issued by it without consideration, and denied that Continental was a bona fide purchaser for value without notice of the infirmity in the shares.

The case was heard by the Chancellor on oral testimony and depositions. He found as a fact that Continental had discharged its burden of proving that it was a bona fide purchaser without notice. Twinlock appeals.

The facts concerning the making of the loan, established by the record and found by the Chancellor, are as follows:

Continental was a banking institution of the State of California. At the times here pertinent Joseph Blau was its president and Russell Knapp its secretary-treasurer and attorney.

A few weeks before the loan was made James G. Fuller was introduced to Blau. Fuller wanted money. He immediately told Blau that he had a criminal record. Blau gathered that Fuller had been a "five percenter", although in fact Fuller was a "confidence man" who had served a long jail term for mail fraud.

Fuller wanted two loans, one for his personal expenses and another to enable him to buy Twinlock stock. Blau approved a loan of $41,000 for the expenses, to be secured by the 32,000 shares of Twinlock already referred to. He also approved another loan of $159,000, but this credit was made conditionally, and was in fact not used.

Blau examined Twinlock's financial statement, and obtained information about its business prospects. He then referred the matter of the $41,000 loan to Knapp, who attended to the preparation of the necessary papers. Knapp obtained from Twinlock a stockholders' list and verified the fact that the holders of the certificates (Fuller and one Gordon) were registered owners.

The loan was then made. The nominal borrower was Alice Morgan, Fuller's wife, with Fuller's endorsement. The proceeds were deposited to her credit. Blau adopted this course because he feared a loan made direct to Fuller, an ex-convict, might be criticized by the California banking department.

The loan was granted, Knapp testified, in reliance upon the collateral and upon the applicable provisions of the *Uniform Stock Transfer Act,* which he found to be in force in Delaware. 8 *Del.C.* § 181, § 185, and § 187.

Neither Blau nor Knapp had any knowledge of any illegality in the issuance of the pledged shares.

But for the fact of Fuller's criminal record, the foregoing facts would abundantly sustain a finding that the pledgee was a bona fide purchaser for value and entitled to the protection of the Uniform Stock Transfer Act. Indeed, reliance on the certificates alone, absent any suspicious circumstances, would have been justified. This rule was applied even before the passage of the uniform act. *Delaware-New Jersey Ferry Co. v. Leeds,* 1936, 21 *Del.Ch.* 279, 186 *A.* 913.

But the fact of Fuller's criminal record would normally suggest some caution in making the loan. Blau characterized him as "brilliantly irresponsible". In the instant case Knapp obtained proof of Fuller's ownership by checking Twinlock's stock list. Unless it is

the law that any bank lending money to a person with a criminal record does so at its peril, the steps taken by Continental's officers would seem sufficient to protect it.

Twinlock advances two contentions opposed to this conclusion.

First, it appears to argue that Blau's knowledge of Fuller's record and the deceit practiced in making Alice Morgan, the nominal borrower are sufficient in themselves to deprive Continental of the protection of the statute.

As indicated above, we do not agree. In any particular case the question whether the lending bank is put on notice of an infirmity in the title of its pledgor is, as the Chancellor said, a question of fact. The only notice here relied on is the fact of Fuller's conviction. This fact was wholly unrelated to the alleged invalidity of the shares.

Twinlock cites a number of cases sustaining findings denying to purchasers or pledgees the status of bona fide purchasers for value. We have examined them but they do not support Twinlock's contention. In every case there were circumstances tending to show either actual knowledge of defective title in the pledgor, or of suspicious circumstances attending the transaction itself. They are not apposite.

Second, Twinlock appears to argue that the fact of Fuller's criminal record was sufficient to put Continental on notice that there might well be some infirmity in the issuance of the shares to Fuller, and hence that further inquiry concerning the validity of the shares should have been made. Twinlock invokes the principle that under some circumstances a bank on notice of irregularity in the collateral tendered by its borrowers may be bound by all the facts which a proper inquiry would have disclosed. See 8 *Am.Jur.*, *"Bills and Notes"*, §§ 388-389; cf. *Mason v. Public National Bank & Trust Co.*, 262 *App.Div.* 249, 28 *N.Y.S.2d* 416, 421-422.

On its face this argument is of doubtful soundness. As already noted, the fact of Fuller's criminal record does not of itself suggest that there was any infirmity in the issuance of the shares. His title as registered owner had been confirmed by Twinlock.

But let us assume, as the Chancellor did, that Continental was charged with knowledge of any facts concerning the issuance of the stock that further inquiry would have disclosed. What could Blau have learned?

Twinlock contends that the stock was issued without consideration and that the shares were canceled by resolution of Twinlock's board of directors in September 1958.

The facts are these:

In early 1956 Fuller began negotiations with three men, Agron, Clifford, and Frank, concerning the purchase or refinancing of several of their companies. One of these companies was Twinlock, Incorporated, a California corporation (not the defendant here). It was formed to produce a "terminal strip" used in connection with the Nike missile. This device was covered by a patent application owned by Agron, Clifford, and Frank. Fuller negotiated an agreement with them whereby the patent application was to be sold to Unaco, Inc. (for which Fuller was acting) for $1,250,000 payable largely out of production profits. A down payment of $40,000 was required, and an additional $180,000 was to be raised by the sale of stock of Twinlock of California. Fuller obtained from LaGrange & Co., a New York stock exchange firm, a commitment to sell the shares. Twinlock of Delaware was organized to acquire Twinlock of California, the patent application and the LaGrange contract. A purchase agreement was drafted. As contemplated by that agreement Fuller organized a board of seven directors.

The first meeting of the board of directors of Twinlock of Delaware was held November 9, 1956. The minutes recite that Unaco had obtained an option to purchase the invention covered by the patent application. A copy of the draft agreement of purchase was submitted to the board. The minutes then state:

"The assignment of said agreement (as may be modified) is offered to Twinlock of Delaware in exchange for 90,000 shares of its Class B. stock, together with the commitment from La-Grange & Company, copy of which is annexed to these minutes and made a part hereof."

The minutes, after reciting the formation of Twinlock of California, further provide that Unaco shall deliver to Twinlock of Delaware all of the shares of stock of Twinlock of California.

The officers of the corporation were duly authorized to issue the 90,000 shares of stock. The 32,000 shares subsequently pledged by Fuller with Continental were a part of the 90,000 shares so authorized.

These minutes, though perhaps not expertly drawn, are regular on their face. The consideration for the issuance of the stock is specifically stated. Further inquiry by Blau, therefore, concerning the circumstances of the issuance of the shares would have disclosed nothing indicating invalidity. Twinlock says that the recited consideration for the shares was illusory, and was subsequently shown to be no consideration at all. It says that later Twinlock's directors determined that Fuller had no option; that the purchase agreement was not signed until November 30th; that LaGrange defaulted on its agreement; and that in September 1958 Twinlock's board canceled the 90,000 shares issued at the September 1956 meeting.

Continental challenges these assertions and asserts that the shares were validly issued. We do not reach this question, because it is abundantly clear that at the time Continental made the loan no challenge to the validity of Fuller's shares had been made, although more than a year had elapsed since their issuance. It is elementary that the status of Continental as a bona fide purchaser for value is to be determined as of the time the loan is made. How the subsequent knowledge and action of the Twinlock directors can affect Continental's status in October 1957 we are unable to see.

We think Twinlock's position devoid of any merit.

One further comment must be made. Twinlock's brief is interspersed with charges attacking the integrity of Blau and Knapp. Thus it is said that Blau was intending to enrich himself through Fuller's intended acquisition of Twinlock; that Knapp was Fuller's attorney; that subsequently Knapp, in executing on behalf of Essex (Twinlock's parent corporation) a loan agreement with Fuller in-

volving 47,000 shares (including the 32,000 already pledged), erroneously recited the 32,000 shares as unencumbered; and that the $41,000 transaction was not a loan at all. (What it was, if not a loan, is not explained.)

All of these charges are either assertions unsupported by the evidence or concern matters on their face wholly immaterial.

The Chancellor's finding of fact that Twinlock was a bona fide purchaser for value is amply sustained by the evidence. It will not be disturbed here.

The judgment of the Court of Chancery is affirmed.