**TRAVIS INVESTMENT CO., a partnership, Plaintiff,**

v.

**HARWYN PUBLISHING CORPORATION and Bankers Trust Company, Defendants.**

**No. 64 Civ. 3862.**

United States District Court
S. D. New York.
June 17, 1968.

---

Colton & Pinkham, by Spencer Pinkham, New York City, for plaintiff.

Gartenberg & Ellenoff, by Irving L. Gartenberg, New York City, for defendant Harwyn Publishing Corporation.

OPINION

BONSAL, District Judge.

Plaintiff Travis Investment Company (plaintiff), a Colorado partnership, instituted this diversity action against defendants Harwyn Publishing Corporation (Harwyn) and Bankers Trust Company (Bankers), both New York corporations, for damages resulting from an alleged failure to transfer shares of Class A common stock of Harwyn (Harwyn stock). The action was discontinued as against Bankers before trial.

In the pretrial order, filed on November 15, 1966, the parties stipulated that the following facts were not in dispute:

1. Travis is a money lender. On or about October 10, 1963, the plaintiff loaned $25,000 to one, Jay Cohan, a resident of Denver, originally secured by 3800 shares of Harwyn stock of which 1000 shares were subsequently returned to Mr. Cohan. On January 8, 1964, the plaintiff similarly loaned $25,000 to one, Stanley M. Singer, originally secured by 3200 shares of Harwyn stock, subsequently increased to 5300. The promissory notes given by Messrs. Cohan and Singer to the plaintiff each contained a provision that, upon any default, the plaintiff might sell the collateral at public or private sale or on any broker's board without any demand or notice to the borrower.

Prior to the 1st of February, 1964, both of said notes were in default, and the plaintiff, being the holder thereof, became entitled, as between itself and the borrowers, to sell said Harwyn stock pursuant to the terms of said notes.

At all times herein mentioned, Bankers was transfer agent of Harwyn's stock.

2. On or about February 20, 1964, Bankers, as transfer agent for Harwyn, received written notification from the New York Regional Office of the Securities and Exchange Commission (S.E.C.) that it (the S.E.C.) had reason to believe that shares of Harwyn stock might appear upon the market which were owned by persons in a control relationship with Harwyn and which persons might attempt to sell such shares without registration and without the availability of an exemption under the Securities Act of 1933. Bankers was requested to notify the S.E.C. in respect of any request for transfer of any of Harwyn stock. At or about the same time the S.E.C. had advised Harwyn that it had reason to believe that a control group located in Denver, Colorado, Boston, Massachusetts, and Canada was unlawfully seeking to sell shares of Harwyn stock in the over-the-counter market and requested Harwyn to advise the S.E.C. of any request for transfer of any shares originating from any of those areas prior to transfer.

3. About February 21, 1964, Travis delivered its certificates for 8100 shares of Harwyn stock to Bache & Co. (Bache), its broker, with a request that Bache sell the same as rapidly as it could, but from time to time, in an orderly manner, so as to realize as favorable prices as might be possible.

4. On February 21, 1964, Mr. Charles D. Halsey, a General Partner of Bache, spoke with Bankers and with Mr. Soloway of Gartenberg & Ellenoff, attorneys for Harwyn, and asked whether there had been any transfer stops placed against any shares of Harwyn stock. On February 25, 1964, Mr. Halsey sent a list to Mr. Soloway setting forth the names in which the certificates making up the 8100 shares of Harwyn stock were registered and the certificate numbers of each such certificate. On the

same day, Mr. Soloway advised Mr. Halsey that Harwyn would require a writing setting forth the name of the beneficial owner of each of the shares covered by the list and further particulars concerning ownership.

5. On February 26, 1964, Bache delivered certificates for 1000 shares thereof, together with certificates for 300 shares owned by persons other than the plaintiff, to Bankers for transfer into Bache's street name. Simultaneously, Mr. Halsey advised Mr. Soloway that he could not disclose the name of the owner of the 8100 shares until he received permission from Bache's customer but requested that the certificates be checked by number for any infirmity. Mr. Soloway, in turn, advised Mr. Halsey that such name was a prerequisite to transfer.

6. On February 28, 1964, Harwyn notified Bankers to make no transfers whatever of Harwyn's shares without prior advice to and further instructions from Harwyn, sending a copy of such letter to the S.E.C.

7. On March 6, 1964, Louis G. Isaacson, Esq., attorney for the plaintiff in Denver, wrote Mr. Soloway, as attorney for Harwyn, stating that he (Isaacson) represented the plaintiff; that he had been advised that Harwyn had refused to transfer the shares; and that, unless any stop order was immediately removed, and the shares transferred, an action would be commenced on behalf of the plaintiff for the damages suffered. Such letter disclosed the name of the plaintiff as the owner of the shares.

8. On March 10, 1964, Mr. Soloway wrote Mr. Isaacson stating that there were questions as to whether the shares referred to in Mr. Isaacson's letter were "controlled shares" and claiming to have requested Mr. Halsey to obtain the facts surrounding the ownership of said shares and an opinion from counsel for the plaintiff in respect of the possibility that the shares were being offered by members of a control group.

9. On March 12, 1964, Mr. Soloway instructed Bankers to make no transfers unless and until an opinion by counsel for any prospective transferor had been received, which set forth all of the details of ownership and included an opinion that the shares were not being offered by a member of a "control group" within the meaning of the Securities Act of 1933.

10. On March 16, 1964, Bache requested that the 1300 shares, which had been put in for transfer, be returned, and they were so returned.

11. During all of this time Harwyn kept the Regional Office of the S.E.C. advised as to all of the facts and events referred to above.

12. The bid and asked prices for shares of Harwyn stock on the over-the-counter market, as reported by the National Quotation Bureau, were as follows:

| 1964 | BID PRICES | | ASKED PRICES | |
|---|---|---|---|---|
| | HIGH | LOW | HIGH | LOW |
| FEBRUARY 25 | 9 | 8 | 10 | 9 |
| FEBRUARY 26 | 8 | 8 | 9 | 9 |
| FEBRUARY 27 | 8½ | 7¾ | 9¼ | 8¾ |
| MARCH 6 | 8¾ | 8¼ | 9¼ | 9 |
| MARCH 9 | 8½ | 8½ | 9¼ | 9¼ |
| MARCH 10 | 8¾ | 8½ | 9½ | 9¼ |
| APRIL 14 | 5¾ | 5¾ | 6¾ | 6¾ |

April 14, 1964 was the last quotation for shares of Harwyn stock and thereafter there was no further published market for the shares.

At the trial, the following additional facts were established:

1. Plaintiff is a Colorado partnership consisting of Moss Travis and his former wife; according to Travis, plaintiff did an annual volume of business in 1963 and 1964 of $600,000 to $800,000; almost all of its loans were collateralized by local real estate or livestock.

With the exception of the two loans involved here, plaintiff has made only two loans collateralized by securities. The first, in 1960 or 1961, involved securities of Consolidated Oil and Gas. After the death of the pledgor, plaintiff sold the pledged securities to a broker. Thereafter, plaintiff learned from the broker and the issuer that the securities had not been registered under the 1933 Act. The second loan was to Travis' local stock broker, Mr. Heisler, and the collateral was a small amount of Consolidated Electric Securities; no problems had arisen from this loan.

2. Plaintiff had made prior substantial loans to Jay Cohan and Stanley Singer on several occasions. At the time of the $25,000 loan to Singer in January 1964, Singer owed plaintiff $72,000 from a prior loan, which had been collateralized by real estate. At the time of the $25,000 loans to Cohan and to Singer, Travis did not ask for financial statements from Cohan or Singer and did not check out the ability of either Cohan or Singer to repay the loans.

3. On October 10, 1963, Travis met with Cohan and Singer in Travis' home, which also served as his office. Travis, acting for plaintiff, agreed to loan Cohan $25,000 for six months, with 2% interest on the unpaid balance due on the 10th day of each month. The promissory note stated that

failure to make any payment of principal or interest when due shall cause the whole note to become due at once, at the option of the holder of the note.

4. As collateral for the loan, Cohan delivered to Travis about 3800 shares of Harwyn stock. Cohan had told Travis that Harwyn had a good potential for growth and good earnings. Travis checked with the *Wall Street Journal*, with Bache, and with others, to see whether there was a market in the stock so that the collateral could be foreclosed if necessary.

5. The 3800 shares which Cohan delivered were made up of a number of stock certificates, in denominations of 100 shares or less, mostly in "street name," that is, registered in the names of brokerage houses or securities dealers, and endorsed by them with signatures guaranteed. Travis had never before dealt with stock certificates in "street name." [1]

6. At the time of the loan, Cohan told Travis that he was going to use the money Travis was lending him to buy more Harwyn stock.

7. On November 10, 1963, Cohan paid Travis the $500 interest due under the note. Soon thereafter, at Cohan's request, Travis released 1000 shares of the Harwyn stock being held as collateral and returned the shares to Cohan. Thereafter, on December 10 and January 10, Cohan paid Travis the interest payments then due on the note.

8. On January 8, 1964, Travis agreed to loan Singer $25,000 for 30 days at 2% interest on the unpaid balance, payable in full on February 8, 1964. Travis received as collateral 3200 shares of Harwyn stock, consisting of a number of stock certificates in denominations of 100 shares or less, mostly in street

---

1. Some of the street name certificates were registered in the name of Bache. William J. Goldenblum, Regional Counsel for Bache, who testified for plaintiff at trial, stated that it was very unusual for a Bache customer to have securities in his possession registered in Bache's street name. He stated that, as a general policy, a customer of Bache or other brokerage houses would not be permitted to retain securities in street name but would be required to have them registered in his own name. Securities in street name are customarily held by the brokerage houses in their vaults.

name. Singer told Travis that some of the 3200 shares were borrowed from either John DiAndrea, in whose name some of the certificates were registered, or Jay Cohan.

9. At the end of January 1964, Travis testified that Singer told Travis that he could not pay the loan on time but that he would deliver to Travis more shares of Harwyn stock as collateral. Travis asked for more collateral, because, as he later said, the "Harwyn deal" was becoming a "bit shaky." He said that the expression "Harwyn deal" referred to the two loans secured by Harwyn stock.

10. On February 1, 1964, Cohan and Singer told Travis that they had no money and would not be able to pay back the loans or meet the interest payments on time. Travis said that if they did not, he would consider that the loans were in default; and that he would "sell them out," that is, realize on the collateral. Cohan and Singer asked Travis not to sell them out, as it would hurt the market.

11. On February 8, 1964, the Singer note went into default for failure to pay the interest and principal then due; and on February 10, 1964, the Cohan note went into default for failure to pay the $500 of interest then due.

12. On the evening of February 11, 1964, Singer entered Travis' home through the back door and gave Travis an envelope which he said contained shares of Harwyn stock to serve as additional collateral for his loan. Travis told Singer that his note would now be payable on demand. Later that evening, Travis opened the envelope and discovered it contained certificates for 2100 shares of Harwyn stock. Most of the certificates were in street name; and the denomination of each certificate was for 100 shares or less.

13. A few days after receipt of the additional collateral, Travis told Cohan and Singer that he needed his money and would have to sell them out. Singer then told Travis that the additional collateral of 2100 shares of Harwyn stock was to serve as collateral for the loans of both Cohan and Singer.

14. On or about February 20, 1964, Travis called his stockbroker in Denver, Mr. Heisler, told Heisler he was the pledgee of 8100 shares of Harwyn stock, and said he wanted to sell the stock. Harwyn stock was then quoted at about $11 per share, at which price the 8100 shares would bring $89,000 compared to the amounts then due under the loans of some $51,000.

Heisler advised Travis that it would be easier to sell such a large number of shares "out of town" and he gave Travis the telephone number of Mr. Howard Lindquist, who was employed by Bache in Chicago.

15. Travis then called Lindquist in Chicago and asked him whether Bache could sell the 8100 shares. Travis did not tell Lindquist that he had received the shares as a pledgee. Lindquist called Travis back a short time later and told him that Bache could sell the shares for him and that Travis should send them to Chicago.

16. On the same day, Travis took the shares to the First National Bank of Denver and the Bank mailed them to Bache in Chicago. They were received in Chicago on Friday, February 21, 1964. During the next few days, Travis received a phone call and met with representatives from the S.E.C.'s Denver office, who asked him about his dealings in Harwyn stock and told him that several persons in Denver were attempting to corner the market in Harwyn stock. After speaking to the S.E.C., Travis spoke several times with Cohan and Singer about Harwyn stock and learned about their dealings in the stock. Travis said that there were too many conversations for him to be able to remember the substance of any of them.

17. On February 21, 1964, Bankers called Gartenberg & Ellenoff, Harwyn's General Counsel, to advise them that Bankers had received an inquiry from

Bache in New York about the transfer of shares of Harwyn stock.

18. On February 25, 1964, Bache delivered to Gartenberg & Ellenoff a handwritten, three-page list, giving, with respect to each certificate composing plaintiff's 8100 shares, the certificate number, the name of the registered owner, and the number of shares each certificate was registered for; there were 84 certificates listed in 38 different names.

19. A copy of this list was hand-delivered to Mr. David Bicks of the S.E.C. in New York on the same day, pursuant to a telephone conversation between Mr. Bicks and Mr. Harvey Siegel, President of Harwyn.

20. On February 27, 1964, Mr. Soloway received a letter dated February 26, 1964, from Mr. Halsey, stating that Bache's "Legal Department has advised me that we can divulge [the name of the customer selling the Harwyn stock] to you if the customer has no objection. I will try to contact the customer to obtain approval to do this, in which case I will be glad to give it to you."

21. On February 28, 1964, Mr. Irving L. Gartenberg, Secretary and Director of Harwyn since 1961, and a member of Gartenberg & Ellenoff, wrote Mr. Llewellyn Young of the S.E.C. enclosing a copy of the letter dated February 26, 1964, from Mr. Halsey to Mr. Soloway; and a copy of a letter dated February 28, 1964, from Mr. Gartenberg to Bankers, in which Bankers was instructed "to stop all transfers, advise the Corporation and await further instructions with respect to the transfer of the certificates representing 8100 shares of [Harwyn stock] set forth on the attached list."

22. Between February 28 and March 10, 1964, there were several telephone conversations between Gartenberg & Ellenoff and Bache, and Gartenberg & Ellenoff and the S.E.C.

23. On March 9, 1964, and on March 10, 1964, Mr. Soloway received letters addressed to Bankers and to himself, both dated March 6, 1964, from Louis G. Isaacson, a lawyer in Denver. Both letters contained the subject heading "In re: Travis Investment Co." This reference to Travis Investment Company was the first indication that either Harwyn or Bankers had had as to the identity of the owner of the 8100 shares.

24. On March 12, 1964, Mr. Soloway wrote Mr. James Gaskin of Bankers to instruct him as Transfer Agent to "require all brokers handling transactions emanating from [Canada, Colorado, and Boston, Massachusetts] to obtain and deliver to this office a letter of opinion from counsel of its customer setting forth the facts relating to the proposed transfer, including the ownership and/or beneficial ownership of said shares * * * and an opinion of such counsel that such shares are not * * being offered by a member of or a control group."

25. On March 16, 1964, Mr. Gartenberg wrote Mr. Bicks of the S.E.C. that "Bankers had been requested by Bache * * * to return the certificates representing 1300 shares of [Harwyn] stock which heretofore they were attempting to transfer on behalf of a customer in Denver, Colorado * * * We have instructed Bankers * * * to return without transfer these certificates to Bache * * *"

The foregoing constituting the Court's findings of fact, the Court makes the following conclusions of law, Rule 52(a), F.R.Civ.P.:

Under New York law as it was prior to the adoption of Article 8 of the Uniform Commercial Code,[2] the plaintiff (as purchaser) had the right to have its shares registered for transfer on the books of the corporation, Cooper v. Gossett, 263 N.Y. 491, 189 N.E. 562 (1934); Casey v. Kastel, 237 N.Y. 305,

2. The Uniform Commercial Code does not apply to this action because the events in this action occurred before September 27, 1964, the effective date of the Uniform Commercial Code in New York, §§ 10–101, 10–105.

142 N.E. 671, 31 A.L.R. 995 (1924); Travis v. Knox Terpezone, 215 N.Y. 259, 109 N.E. 250, L.R.A.1916A, 542 (1915); see in general, N.Y. Law Revision Commission, Study of Uniform Commercial Code, Article 8 110 (1955) (hereinafter cited as Commission Study), if he was a good faith purchaser for value, without notice of any facts making the transfer wrongful, see Jackson Heights Courts v. 171 Twenty-Fourth Street, 83 N.Y.S.2d 424 (Sup.Ct.1948), modified, 274 App. Div. 1070, 85 N.Y.S.2d 618, aff'd, 299 N.Y. 650, 87 N.E.2d 54 (1949), Mason v. Public National Bank & Trust Co. of New York, 262 App.Div. 249, 28 N.Y.S. 2d 416 (1941), aff'd, 287 N.Y. 809, 41 N.E.2d 91 (1942), Commission Study at 112.

■■ At trial, Harwyn put into issue the plaintiff's good faith by showing the circumstances under which the plaintiff took the 8100 shares of Harwyn stock as pledges and from which the plaintiff should have become aware or been put on notice that a transfer of the shares of Harwyn stock might be wrongful under the 1933 Act, see S.E.C. v. Guild Films Co., 279 F.2d 485 (2d Cir.), cert. denied sub nom. Santa Monica Bank v. S.E.C., 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960); also, see Sargent, Pledges and Foreclosure Rights under the Securities Act of 1933, 45 Va. L.Rev. 885 (1959); a failure to inquire further where circumstances put one on notice of a wrongful transfer constitutes a lack of good faith, Mason v. Public National Bank, supra, and the plaintiff would thereby be charged with knowledge of the wrongfulness of the transfer which an inquiry would have revealed.

■ However, even if plaintiff acted in good faith, Harwyn could refuse to register the shares upon presentation if it had reasonable grounds for doing so, Luitwieler v. Luitwieler Pumping Engine Co., 118 Misc. 192, 192 N.Y.S. 891, 893 (Sup.Ct.1922), see Doliner v. Eastern Can Co., (N.Y.Law Journal, p. 17, col. 4, June 2, 1965), aff'd 25 A.D.2d 719, 268 N.Y.S.2d 970 (1966), Commission

Study at 112, 119, such as having received information of a possibly wrongful transfer because of doubtful title, Hillary Holding Corporation v. Brooklyn Jockey Club, 88 N.Y.S.2d 198, 201 (Sup. Ct.1949), cf. Van Schaick v. National City Bank of New York, 245 App.Div. 525, 283 N.Y.S. 372 (1935).

■ It is clear that under the circumstances here, Harwyn had reasonable grounds to refuse to authorize the transfer of shares when they were first presented by Bache to Bankers on February 21, 1964. At that time, both Bankers and Harwyn had been notified in written form by the S.E.C. that shares of Harwyn stock might be presented for transfer by persons in a control relationship with Harwyn. Harwyn and Bankers were, thus, aware of a proposed transfer which might be a "wrongful" transfer under the 1933 Act, see Sargent, Pledges and Foreclosures, supra; S.E.C. v. Guild Films Co., supra.

Thereafter, Bache delivered 1000 of plaintiff's shares to Bankers for transfer, indicating, with respect to the ownership of the shares, only that the owner was from Denver, Colorado. By this time, the S.E.C. had told Harwyn that the control group about which the S.E.C. was concerned originated from Denver, among other places. Knowing that the owner was from Denver, Harwyn acted reasonably in seeking further information as to the identity of the owner and a legal opinion from plaintiff's counsel that the shares were not being tendered by a "control group."

■ From the time that the shares were first received by Bache and tendered to Bankers on February 21, 1964, until the shares were withdrawn by Bache on March 16, 1964, a period of 24 days, including 17 market days, had elapsed. This is not an unreasonable time for Harwyn to refuse to transfer the shares, pending receipt of further information which it had a right to request. Compare U.C.C. § 8–403(2) (30 days presumed to be reasonable).

Therefore, plaintiff has not proved that Harwyn's refusal to transfer the shares was wrongful and in violation of its duty to plaintiff; and Harwyn has established that its refusal to transfer the shares and its request for more information as to ownership and control was reasonable.

The Clerk may enter judgment for defendant Harwyn dismissing the complaint with costs.

It is so ordered.