The **FIDELITY AND CASUALTY COMPANY OF NEW YORK** and **E. F. Hutton and Co. Inc.,** Plaintiffs-Appellants,

v.

The **KEY BISCAYNE BANK,** Defendant-Third Party Plaintiff-Appellee,

v.

**Charles L. LEWIS,** Third Party Defendant-Appellee.

No. 72–2545.

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1974.

Rehearing and Rehearing En Banc Denied Nov. 13, 1974.

James E. Tribble, John B. Kelley, John R. Hoehl, Mark Hicks, Miami, Fla., for plaintiffs-appellants.

Peter T. Fay, Alan G. Greer, Miami, Fla., for Bank.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

We review the dismissal below with prejudice of plaintiff Fidelity & Casualty's suit to recover the value of stolen stock certificates, granted after full evidentiary hearing on the motions of the defendant Key Biscayne Bank and the third party defendant, Charles L. Lewis.[1] The certificates were transferred to the Bank by Lewis as collateral for a loan. We conclude that the district court properly determined that the plaintiffs failed to rebut the Bank's showing that it was a bona fide purchaser for value without notice of adverse claims and entitled to possession of the stock under Fla.Stat. Sec. 678.8–301(2). Accordingly, we affirm.

At sometime during the period between May 1, 1968, and July 26, 1968, a block of certificates for 5000 shares of stock in International Business Machines, Corp. (IBM) disappeared from the vaults of appellant E. F. Hutton & Co. (Hutton). Their disappearance became known through an audit of Hutton by Haskins & Sells commenced on July 26 and completed on August 15, 1968. Hutton became aware of the possible theft of the stock certificates on September 13, 1968, at which time it notified the New York City Police, the Federal Bureau of Investigation, and its surety, appellant Fidelity & Casualty. A special audit by Haskins & Sells, commenced in October 1968 and completed in December 1968 produced the serial numbers of the missing stock certificates.

Prior to that time the third party defendant Charles L. Lewis appeared at the office of the appellee Bank in Key Biscayne, Florida on July 30, 1968, seeking a $195,000 loan, assertedly for the purpose of acquiring an interest in a Florida airline. Lewis offered nine certificates each representing 100 shares of IBM stock as collateral. Each certificate was in the "street name" of E. F. Hutton & Co. and endorsed in blank by

---

1. This is the second appearance of this litigation before this Court. The first appeal was from an order dismissing the plaintiffs' suit with prejudice, after a full evidentiary hearing. We determined that despite the reasons dictated in the record by the trial court, its failure to enter findings of fact and conclusions of law in accordance with F.R.Civ.P. 41(a) prevented our giving confident consideration to the issues presented on appeal. We remanded for the entry of such findings and conclusions as provided for in F.R.Civ.P. 52(a). Fidelity and Casualty Co., et al. v. Key Biscayne Bank v. Lewis, 5 Cir. 1973, 483 F.2d 438. The case is back before us on the findings and conclusions entered below on remand.

Hutton. The district court found that: "Each of the stock certificates states in the assignment form on its reverse side that when endorsed in blank, 'this stock certificate becomes fully negotiable, similar to a check endorsed in blank.'" (Unpublished opinion, Finding of Fact # 4).

On July 31, the Bank's officers checked with IBM by telephone regarding its registration of the certificates. IBM reported that the stock was listed in the name of Hutton. Hutton was telephoned and advised that there were no stops or holds in effect as to the stock. IBM upon request transferred the registration of the stock to the name of Lewis and issued new certificates in Lewis's name. The Bank granted the loan to Mr. Lewis and retained the nine stock certificates, whose market value was about $338,000, as collateral.

On September 23, 1968, Hutton issued notice to public and financial institutions that it was missing approximately 10,000 shares of IBM stock. Because of the prior transfer in registration of the 900 shares here involved from Hutton's name into Lewis's, the notice did not include these 900 shares.

In October 1968, the appellee Bank gave notice to Lewis that it intended to call his loan. In response, the Bank received instructions from Lewis to sell the 900 shares to satisfy the debt and to credit Lewis's account with whatever excess remained from the sale of stock. The Bank, in compliance with these instructions, sold the shares in two blocks, 600 shares on October 17 for approximately $196,000, and the remaining 300 shares on November 13 for an amount not appearing in the record. The excess over the amount outstanding on the loan was credited to Lewis's account.

It was not until December 5, 1968, however, that Hutton learned that the 900 shares here involved were among those that had been missing from its vault prior to July 26. Hutton notified its insurer, Fidelity & Casualty of the loss and this suit ultimately resulted.

At the trial the plaintiffs presented only three witnesses in support of their case in chief. An executive vice-president of Hutton testified as to the disappearance of the 900 shares of IBM stock here in question sometime prior to July 26, 1968, and further established that Hutton became aware that the 9 certificates involved were among those missing only at the completion of the Haskins & Sells special audit on December 5, 1968. Appellants' second witness was the Chairman of the Board and President of appellee Bank, Charles G. Rebozo, called under the adverse party rule, Rule 43(b), F.R.Civ.P. who related the particulars of the presentation of the stock certificates to the Bank by Lewis on July 30, 1968. Appellants' final witness was an officer of Fidelity & Casualty who testified to payment of Hutton's claim under its surety bond for the missing securities, establishing Fidelity & Casualty's right to subrogation to Hutton's claim.

At the close of the plaintiff-appellants' case in chief, the appellee Bank moved for a directed verdict in its favor.[2] The court granted the motion and entered judgment thereon. The prior appeal and remand ensued, (note 1, supra) followed by the entry of written findings and conclusions and reargument and submission to this panel.

Appellants raise two basic issues on this appeal. They argue first that the trial court improperly failed to place the burden of proving whether the Bank enjoyed the status of bona fide purchaser (BFP) of the securities in question upon the defendant below. They assert: (i) that the common law existing prior to the adoption of the Uniform Commercial Code in Florida is preserved to the extent it does not conflict with the provisions of the Code; (ii) that the Code

---

2. A misnomer. Properly the motion was one to dismiss under Rule 41(b), F.R.Civ.P. We so refer to it herein. See James v. DuBreuil, 5 Cir. 1974, 500 F.2d 155 [decided September 12, 1974, Note 2 and supporting text].

is silent as to allocation of the burden of proving BFP status of a purchaser of securities; (iii) therefore, that pre-code law regarding burden of proof in actions for conversion should govern; and (iv) finally, that the burden of proving BFP status vel non in suits for conversion was upon the defendant Bank and should have been, but was not imposed below.

The second issue raised by appellants regards the scope of cross-examination of Bank's President Rebozo, who was called by the plaintiffs as an officer of an adverse party under Rule 43(b), F.R.Civ.P. The contention is that the rule strictly limits the scope of cross-examination of an adverse witness to the matters addressed on direct examination, and that, to the contrary, appellee's counsel was allowed to cross-examine witness Rebozo as to the bona fides of his acceptance of the stock certificates as collateral from Mr. Lewis. This, according to appellants' view, constituted testimony in the nature of an affirmative defense and regarding matters not opened on direct examination. Absent consideration of this improperly allowed testimony, appellants say, the record before the trial judge was insufficient to support the granting of appellee's motion to dismiss. These issues are dealt with in that order.

*Burden of Proof*

Appellants argue that, under the common law of conversion existing in Florida prior to the adoption of the Uniform Commercial Code, a plaintiff need only show rightful ownership of the stock certificates in order to shift to the defendant the burden of proving his status as a BFP, for value and without notice of adverse claims. Appellees reply that the provisions of Article 8 of the UCC as adopted in Florida, Fla.Stat. ch. 678, take precedence over the common law of conversion in suits to recover stock certificates, and that under the UCC the burden is upon the claimant to prove that the purchaser was *not* a BFP. We are cited to no definitive ruling on this issue by a Florida court, and we need not speculate in this respect.[3] For, assuming the correctness of appellant's position, we find, as did the trial court, that the Bank established prima facie its status as BFP of the IBM certificates in question. The appellants failed to rebut this prima facie showing.

The major portion of the testimony establishing the Bank's prima facie case of BFP status came on cross-examination of the plaintiffs' adverse witness Charles G. Rebozo, chief executive officer of the appellee Bank. We summa-

3. The UCC does not speak specifically to the question. Assuming the correctness of appellants' assertion that pre-Code law is controlling, we think recourse should be had, not to the common law of conversion, but (i) first to the provisions of the Uniform Stock Transfer Act as adopted in Florida, Law of May 31, 1943, ch. 21894, Sec. 1 [1943] (repealed 1967) (formerly Fla.Stat. ch. 614), and (ii) second to the common law rule regarding suits to recover stolen securities or other negotiable instruments.

The courts of Florida long ago observed a common law distinction between suits to recover negotiable instruments and securities and suits in conversion to recover ordinary chattels. Trustees v. Lewis, 1894, 34 Fla. 424, 16 So. 325. This distinction was maintained through the enactment of both the Uniform Negotiable Instruments Law, Law of June 1, 1897, ch. 4524 (repealed 1967) (former Fla.Stat. ch. 674), and the Uniform Stock Transfer Act, *supra.*

Under Sec. 59 of the Negotiable Instruments Law, introduction by the claimant of evidence tending to show his ownership of the paper in question clearly shifted the burden to the holder to come forth with evidence tending to show his status as BFP. This rule explains the decision in Antonacci v. Denner, Fla.App.3d 1963, 149 So.2d 52, relied upon by appellants. The Stock Transfer Act, which would have governed the suit here, has no such provision. *Antonacci,* therefore, is not dispositive.

There is a split of authority on the question whether under prior common law the burden would be on the holder to prove his BFP status once the claimant has introduced evidence of ownership. In support of this rule, see Annot., 52 A.L.R. 957 (1928) and cases cited therein. Contra, Murray v. Lardner, 1865, 69 U.S. (2 Wall.) 110, 121, 17 L.Ed. 857 (applying English common law). We need not attempt to decide the question here for the Florida courts.

rize his testimony: Lewis arrived at the Bank on July 30, 1968 for the purpose of applying for the loan. He was accompanied by a Mr. Walter Jernigan, who was known to Rebozo and who vouched for Lewis's being an Atlanta business man of substance. Lewis represented that the loan proceeds were to be used to purchase an interest in a commercial airline. As collateral for a note in the amount of the loan, Lewis offered nine certificates representing 900 shares of IBM stock. The stock certificates were in street name, that is issued to a brokerage house (here E. F. Hutton & Co.) and endorsed by the broker on the back of the certificate with the transferee's name left blank. Lewis executed a Federal Reserve Board form affidavit stating that he was the rightful owner of the stock certificates, and his name was placed in the transferee blank on the back of the certificates. Earlier direct testimony by Rebozo was to the effect that the Bank had contacted IBM and verified the listing of the stock in Hutton's name, and that the Bank sent the certificates with Lewis's name added as transferee to IBM for issuance of new certificates in Lewis's name. The certificates were issued and held by the Bank.

■ In our view this testimony established a prima facie case that the Bank was a BFP of the IBM certificates. Under the provisions of the UCC as adopted in Florida, the Bank became a "purchaser for value" when it accepted the stock certificates as collateral. Fla. Stat. Sec. 671.1–201(32), (33), & (44) (a) (1973). The "good faith" and "without notice" requirements are practically synonymous.[4]

The narrative outline of Lewis's appearance at the Bank on July 30 and of his presentation of the stock certificates

adequately establishes that the Bank had no notice, actual or constructive, of Hutton's adverse claims to the securities.[5] As one court has noted regarding the use of stock certificates endorsed in blank:

The practice of delivering certificates endorsed in blank in connection with change of title without change in registration [was] stated [citation omitted] as follows: "It is common knowledge that certificates of stock standing in the name of an original owner and indorsed in blank are dealt in thousands of times, and during a period, often of many years, without charge of name of the original owner, although title has changed on innumerable occasions."

The very purpose of rules making certificates negotiable when endorsed in blank is to enable all persons to treat possession of the certificates as equivalent to ownership. * * * To say that a street certificate, endorsed in blank, which ordinarily passes from hand to hand without further endorsement and, hence, does not indicate who was the last preceding owner, gives notice to a transferee of a diversion of the property of the last endorser, ignores the entire history of business experience concerning the delivery of such certificates.

Mason v. Public National Bank & Trust Co., 1941, 262 App.Div. 249, 28 N.Y.S.2d 416, 424. The plaintiffs offered no evidence that the Bank had any notice of Hutton's adverse claim to the IBM stock. The proof in fact was directly to the contrary.

*Cross-Examination Under Rule 43(b)*

Appellants maintain, nonetheless, that the court below should be reversed because the Bank's evidence of its BFP

4. Anderson on the Uniform Commercial Code, Sec. 8–203:3, p. 724 n. 7 (2d ed. 1971).

5. The district court observed that there was testimony to the effect that it was standard practice among stockbrokers not to deliver stock certificates to customers without a de-

livery ticket giving a description of the certificates and their serial numbers, and identifying the customer to whom they were delivered. The district court concluded, however, that there was insufficient evidence to show that the Bank knew or should have known of this practice in another industry.

status was improperly introduced. They argue that the cross-examination of their adverse witness Rebozo was impermissibly broad in violation of Rule 43(b) F.R.Civ.P.[6] Therefore, they contend, the very facts forming the foundation for the lower court's finding in favor of the Bank should have been excluded from the court's consideration. The argument is not convincing.

■ Appellants' position is that their questioning of Rebozo concerned nothing more than the skeletal aspects of Lewis's presentation of the stock as collateral for a loan. The record fails to indicate that the district judge allowed the scope of cross-examination to stray beyond the details of the single transaction covered by the direct examination.[7] It was in the classic mold of legitimate cross-examination to add flesh to the bare bones of the direct examination by development of the surrounding circumstances. The construction of Rule 43(b) advanced by appellant would require the trial judge to notice not only the subject matter of the direct examination, but also the trial strategy of the party calling the adverse witness. The language of the rule does not support such an approach nor do the decisions under it. If it was necessary for the plaintiffs to question Rebozo concerning Lewis's presentation of the IBM stock certificates, it was entirely proper for the defendants to question Rebozo concerning the details of the transaction. Cross examination would be completely sterilized by limiting it to a parroting of the specific questions asked on direct examination. Butler v. New York Central Railroad Co., 7 Cir. 1958, 253 F.2d 281, 283. Cf. Arnold J. Rodin, Inc. v. Atchison, T. &

S. F. Ry. Co., 5 Cir. 1971, 477 F.2d 682, 686.

The court below, therefore, properly considered the matters elicited on cross-examination of witness Rebozo. That testimony, together with other evidence, established prima facie Bank's claim of BFP status regarding the IBM stock certificates. The plaintiffs failed to rebut this prima facie showing. Thus, under Fla.Stat. Sec. 678.8–301, the Bank's claim to the stock certificates was superior to that of Hutton's, and the court was not in error when the motion to dismiss (denominated a motion for directed verdict) was granted under Rule 41(b), F.R.Civ.P.

Affirmed.

6. Rule 43(b) provides in part:
  A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse

party *only upon the subject matter of his examination in chief.* (Emphasis added).

7. Specifically, the trial judge refused to allow counsel for the bank to question Rebozo as to any actions taken after Lewis's leaving the Bank to verify Lewis's ownership of the stock, despite a reference in the opening statement of Bank's counsel to the fact that such efforts were made.

