**OSCAR GRUSS & SON,**
**Plaintiff-Appellant,**

v.

**FIRST STATE BANK OF ELDORADO and Philip Kane and Ralph W. Choiser, Defendants-Appellees.**

**No. 76–1288.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1977.

Decided Aug. 11, 1978.

---

Robert S. Churchill, New York City, for plaintiff-appellant.

John M. Ferguson, Belleville, Ill., for defendants-appellees.

Before SWYGERT and WOOD, Circuit Judges, and EAST, Senior District Judge.[*]

PER CURIAM:

*The Appeal:*

The plaintiff-appellant Oscar Gruss & Son (Gruss) appeals from the judgment entered by the District Court for the defendants-appellees First State Bank of Eldorado (Bank) and Philip Kane (Kane)[1] in Gruss' diversity jurisdiction action for alleged conversion by the Bank and/or Kane of certain United States Treasury Bills (Treasury Bills). This case raises questions involving the interpretation and application of Article 8 of the Uniform Commercial Code (UCC) as adopted by the Illinois legislature.[2] Article 8 governs investment securities and "may be likened . . . to a negotiable instruments law dealing with securities." UCC § 8–101, Comment.

For purposes of this appeal, Gruss relies exclusively on its conversion claim. However, this claim must be judged in the context of the UCC because Treasury Bills are securities within the meaning of Article 8. *Morgan Guaranty Trust Co. of N. Y. v. Third Nat. Bank of Hampden City*, 400 F.Supp. 383, 388 (D.Mass.1975), aff'd, 529 F.2d 1141 (1st Cir. 1976). While providing a remedy for owners of misappropriated securities in § 8–315, the UCC does not foreclose recourse to an action at law for conversion. UCC § 8–315, Comment 2. The UCC has, however, codified the common law protec-

---

[*] Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. Gruss named as an additional defendant to the alleged conversion one Ralph W. Choiser, whose true name is Ralph W. Choisser (Choisser). Choisser died during the pendency of the action and Gruss elected not to name the legal representatives of Choisser as additional parties defendants.

2. The Illinois version of the UCC is codified in Ill.Rev.Stat. ch. 26, § 1–101 through § 10–104. Illinois has adopted the UCC provisions relevant herein without change. Therefore, all sections will be cited to the UCC rather than to the specific Illinois statute.

tion extended to bona fide purchasers[3] in §§ 8–301 and 8–302, and has extended protection to agents in § 8–318 who formerly went unprotected in many jurisdictions notwithstanding that they acted in good faith.

On appeal, Gruss contends that the District Court's decision that the Bank was protected as a bona fide purchaser and that Kane was protected as a good faith agent must be reversed because the District Court improperly placed the burden of proof upon Gruss and because the District Court erroneously found that the appellees acted in good faith.

We note jurisdiction under 28 U.S.C. § 1291, and for the reasons stated below, vacate the District Court's findings of fact, conclusions of law and judgment thereon, and remand.

*Undisputed Factual Background:*

We give the following narration of undisputed factual background for orientation:

Gruss is a general partnership engaged in the security business and is a member firm of the New York Stock Exchange, with its principal place of business located at 80 Pine Street, New York, New York, and was during all pertinent times the owner and holder of ten Treasury Bills with an aggregate redemption value of $27,000 and due July 23, 1970. The Treasury Bills were deposited for safe-keeping in a vault maintained by Gruss on its premises and were not removed from the vault during the normal course of Gruss' business. On July 21, 1970, Gruss, anticipating the due date of the Treasury Bills, looked for the Treasury Bills and found them missing from the vault. It was determined that the Treasury Bills had been stolen and removed from Gruss' premises by an unknown person or persons. The next person known to have possession of the Treasury Bills was Chester Gray (Gray) on the following August 10.

The Bank's principal place of business is located in Eldorado, Illinois. Choisser and various associates purchased the controlling capital stock of the Bank in 1953, and those persons controlled the affairs of the Bank through 1970. Choisser was a director and the attorney for the Bank during the critical times.

In 1957, Choisser was an appointed steward representing the State of Illinois Racing Commission and presided over all the racetracks in the Chicago area. During a social visit among the racing circles of Cook County, Choisser met Gray. Choisser knew Gray as a very wealthy person (or at least that his wife came from a very wealthy family) and a big bettor at the track. Thereafter, Choisser and Gray met in various states throughout the country, both socially and in connection with business enterprises. In August, 1969, Gray appeared without appointment at Choisser's office in the Bank with the advice that he had "come into a lot of money" and that he wished to open an account with the Bank under the alias "Charles Gardner" with an address in Des Plaines, Illinois, 300 miles distant. Choisser knew Gray was a resident of California.

Kane, a lifetime acquaintance of Choisser, was originally employed by the Bank as an assistant cashier in 1966. Thereafter, Kane rose to the positions of cashier and a director of the Bank by 1970.

In the latter part of August, 1969, Choisser, Kane and one William Heise visited Gray in Los Angeles, California in connection with an oil venture and each borrowed $17,500 from Gray for investment in the venture.

3. At common law, a purchaser of stolen personal property was liable to the true owner for conversion notwithstanding that he gave value and acted in good faith and without notice of the theft. *Drain v. LaGrange State Bank*, 303 Ill. 330, 135 N.E. 780, 782 (1922). Restatement (Second) of Torts § 229 (1965); Prosser, Law of Torts, Conversion § 15 (4th ed. 1971); Comment, *The "Know Your Customer" Rule of the* New York Stock Exchange: Liability of Broker-Dealers Under the Uniform Commercial Code & Federal Securities Laws, 1973 Duke Law Journal, 489, 515–16. Even at common law, however, an exception was recognized in favor of bona fide purchasers of stolen negotiable instruments. *Drain*, 135 N.E. at 782. Annot., 52 A.L.R. 947 (1928); *Know Your Customer* at 516.

Shortly after the opening of the Gardner account, Kane commenced a series of embezzlements from the Bank, and by June 6, 1970, Choisser and the officers of the Bank knew Kane's embezzlements amounted to approximately a quarter of a million dollars, including more than $100,000 from Gray's account. Kane was discharged from his duties on June 8, 1970. He subsequently cooperated fully with officers and accountants of the Bank and with special agents of the Federal Bureau of Investigation in investigations into the shortages at the Bank.

On the morning of June 8, 1970 just before his discharge, Kane, on behalf of the Bank, made an unauthorized loan to Gray in the amount of $16,500. A few days prior to August 10, 1970, Kane received a telephone call from Gray inquiring as to whether he could do anything to help Kane in connection with his difficulties at the Bank. At that time, Kane advised Gray that one thing he could do was pay off the $16,500 loan. Gray advised Kane that he would pay off the note if Kane would meet him at the Evansville, Indiana airport on August 10, 1970. Both Kane and Choisser were members of the Board of Trustees of the Conservancy District which had scheduled a meeting for the afternoon of August 10, 1970. Kane informed Choisser of Gray's intention and they agreed that Kane should accomplish the meeting in the best interest of the Bank and deliver the funds to Choisser at the Conservancy District meeting.

Kane met Gray at the Evansville, Indiana airport on schedule where he delivered an envelope to Kane which contained bearer Treasury Bills with a redemption value in excess of the $16,500. Gray instructed Kane to deliver the Treasury Bills to the Bank, to have the note paid off and to credit the excess to the Gardner account. Prior to commencement of the Conservancy District meeting, Choisser received the envelope from Kane containing the Treasury Bills which had been delivered to him by Gray without exchange of receipts or proof of Gray's ownership. These Treasury Bills were later determined to be those owned by and stolen from Gruss.

Following Kane's delivery of the Treasury Bills to Choisser, Kane had no further participation in their redemption which was handled exclusively by Choisser and other officers of the Bank.

The next morning Choisser telephoned the Bank's correspondent bank in East St. Louis, Illinois, and asked for instructions on the procedure used to redeem the Bills. Choisser did not relate from whom he obtained the Treasury Bills, but did say they were past due. Choisser was told that such was routine and to send the Treasury Bills to the correspondent bank so they could be forwarded to the Federal Reserve Bank in St. Louis, Missouri for redemption. Upon being notified of the redemption, the Bank discharged Gray's indebtedness of $16,500 and credited the remainder to the Gardner account. At the time the Treasury Bills were submitted for redemption, they had not been reported missing to the Federal Reserve Bank of St. Louis, Missouri, or to the U. S. Treasury Department.

*Discussion and Conclusions:*

*Gruss' Claim Against the Bank:*

I. *Clearly Erroneous Test:*

The dispute among the parties hinges and swings on whether the Bank had actual or constructive notice of a taint upon the Treasury Bills. The resolution is based upon the factual issue of the bona fides of the transfer from Gray to the Bank, so as to either entitle or deprive the Bank of the protective status of a bona fide purchaser pursuant to UCC §§ 8–301 & 302.[4]

"Purchase," as defined in UCC § 1–201(32), includes the taking of an instrument by negotiation. Bearer instruments are negotiated by delivery alone. UCC § 3–202. Thus, the Bank became a purchaser when Choisser took possession of the Treasury Bills from Kane. *Phoenix Ins. Co. v. National Bank & Trust Co. of*

---

4. UCC § 8–301 provides in part that "[a] bona fide purchaser . . . acquires the security free of any adverse claim." UCC § 8–302 defines a bona fide purchaser as "a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form . . . .."

The District Court found the Bank merited protection as a bona fide purchaser under UCC § 8-301 and Kane received the protection afforded good faith agents by UCC § 8-318.[5]

*Central Pa.,* 366 F.Supp. 340, 342 (M.D.Pa. 1972), aff'd, 485 F.2d 681 (3d Cir. 1973).

Under the UCC, value is given when property is acquired either in satisfaction of a preexisting debt, UCC § 1-201(44)(b), or "in return . . . for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection . . .." UCC § 1-201(44)(a). Generally speaking, checking credit is immediately available credit within the meaning of this section. UCC § 1-201, Comment 44. Thus, the Bank gave value since a portion of the proceeds from the Treasury Bills was used to retire an outstanding loan to Gray and the remainder was credited to Gray's checking account.

5. Specifically, the District Court entered the following pertinent findings of fact and conclusions of law:

*Findings of Fact:*

"13. The Treasury bills were stolen from plaintiff and wrongfully removed from the premises.

"14. The next person known to have possession of the Treasury bills is Gray, on August 10, 1970."

"16. On August 7, 1969 Chester Gray, an old acquaintance of Ralph Choisser, a former defendant now deceased, appeared at the First State Bank of Eldorado and made a deposit of $4,000. On this occasion, Ralph Choisser introduced Gray to Philip Kane, the bank's cashier. An account was opened in the name of Charles Gardner."

"21. On the morning of June 8, 1970, prior to the meeting at which he was discharged, Kane made on behalf of the Bank a personal loan to Charles Gardner in the amount of $16,500, which exceeded Kane's authority."

"31. On August 10, 1970 Kane had no notice or knowledge that Chester Gray's real name was Chester Zochowski or that Chester Gray was under investigation for or involved in any kind of illegal activities.

"32. On August 10, 1970 at the time Gray handed Kane the envelope containing the Treasury bills, Kane had no knowledge or notice that they were stolen. Kane did not examine the Treasury bills sufficiently to determine their maturity date."

"34. On August 10, 1970 Kane had no knowledge of any criminal record involving Chester Gray."

"42. At no time prior to the redemption of the bills did any agent, servant or employee of the First State Bank of Eldorado have any information establishing or tending to establish that there was anything irregular or unlawful about those Treasury bills.

"43. At no time prior to the redemption of the bills did Choisser have any notice or knowledge that Chester Gray was under investigation for or involved in any kind of illegal activities or had any criminal record."

"45. That there was not any means or procedure available to the First State Bank of Eldorado, Illinois, or its agents, servants or employees at the time the bills were submitted for redemption to check the regularity, authenticity or ownership of the bills other than to submit them through the normal procedure for redemption."

"47. Choisser acted in good faith insofar as the redemption of the bills was concerned."

"52. Kane acted in good faith insofar as his part or activity was concerned in the delivery of the Treasury bills from Gray to the Bank.

"53. Plaintiff has failed, in the evidence before the Court, to sustain its burden of proof as to its claim for relief against defendant, Philip Kane.

"54. Plaintiff has failed, in the evidence properly before the Court, to sustain its burden of proof as to its claim against the Defendant, First State Bank of Eldorado."

*Conclusions of Law:*

"2. In the absence of the actual notice or knowledge by defendant First State Bank of Eldorado, that the Treasury bills were stolen and without evidence showing that First State Bank of Eldorado had knowledge of illegal activities by Gray or knowledge of a then current investigation of possible illegal activities of Gray, the First State Bank of Eldorado cannot be found to have participated in any manner in an unlawful conversion of the Treasury bills."

Note: This conclusion of no *actual* notice or knowledge is too restrictive of UCC § 1-201(25).

"3. Under the provisions of Section 8-318 of the Uniform Commercial Code (Ill.Rev. Stat., 1973, ch. 26, Sec. 8-318), First State Bank of Eldorado, who was not in

■ Gruss argues that the clearly erroneous test on our review of the District Court's findings of fact under Rule 52(a) is inapplicable because the determination as to whether one acted in good faith or without notice is a question of law. We disagree. Deciding a case under the Negotiable Instruments Law, wherein the question of notice was linked to that of good faith,[6] the Illinois Supreme Court held the determination of notice to be a question of fact. *Paine v. Sheridan Trust & Savings Bank,* 342 Ill. 342, 174 N.E. 368, 370 (1930). In *Paine,* like here, the determination of whether a party claiming the protected status of a bona fide purchaser acted without notice and in good faith turned on the particular facts involved. We believe a similar conclusion follows under the UCC. *United States v. Second National Bank of North Miami,* 502 F.2d 535, 546–47 (5th Cir. 1974), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975); *Bowling Green, Inc. v. State Street Bank and Trust Co.,* 425 F.2d 81, 85 (1st Cir. 1970).

■ Next, Gruss argues that the clearly erroneous test has no application because the evidence was "virtually undisputed" and because the findings depended largely upon the documentary evidence of Choisser's deposition. Although this argument is not without some support in prior cases, we find it ultimately to be unpersuasive.

■ The language of Rule 52(a) and the decisions of the Supreme Court appear to require the application of the clearly erroneous test when the findings are inferences drawn from undisputed facts, *C. I. R. v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), or solely from documentary evidence. *United States v. Singer Mfg. Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); *United States v. National Assoc. of Real Estate Boards,* 339 U.S. 485, 494–96, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *United States v. United States Gypsum Co.,* 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948). *But see United States v. General Motors Corp.,* 384 U.S. 127, 141–

---

the business of buying, selling or otherwise dealing with securities on August 10, 1970, and who acted in good faith, in receiving and delivering the Treasury bills according to instructions is not liable for conversion or for participation in breach of fiduciary duty even though Chester Gray may have had no right to dispose of them."

Note: The District Court made no finding of fact to support this conclusion.

"5. The First State Bank of Eldorado occupies the position of a bona fide purchaser under Ch. 26, Sec. 301(2) and Sec. 8–302.

"6. The First State Bank of Eldorado was not charged with notice of adverse claims under the provisions of Ch. 26, Sec. 8–304."

"8. Plaintiff has failed to sustain its burden of proof in its claim for relief against defendant, First State Bank of Eldorado.

"9. In the absence of the actual notice or knowledge by defendant, Phillip Kane, that the Treasury bills were stolen and without evidence showing that Kane had knowledge of illegal activities of Gray, Kane cannot be found to have participated in any manner in an unlawful conversion of the Treasury bills.

"10. Under the provisions of Section 8–318 of the Uniform Commercial Code (Ill.Rev. Stat., 1973, ch. 26, Sec. 8–318), Phillip Kane, who was not in the business of buying, selling or otherwise dealing with

securities on August 10, 1970, and who acted in good faith, in receiving and delivering the Treasury bills according to the instructions of Chester Gray, is not liable for conversion or for participation in breach of fiduciary duty even though Chester Gray may have had no right to dispose of them."

Note: This conclusion is not supported by a finding of fact.

"11. Plaintiff has failed to sustain its burden of proof in its claim for relief against defendant, Phillip Kane.

"12. Judgment should be entered against plaintiff, Oscar Gruss & Son, and in favor of defendant[s], Phillip Kane [and First State Bank of Eldorado], on all Counts of the Amended Complaint."

**6.** For example, § 56 of the Negotiable Instruments Law provided:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

New York is the sole jurisdiction to statutorily continue the commingling of these concepts under the UCC. N.Y. U.C.C. § 8–304(3).

42 n. 16, 86 S.Ct. 1321, 16 L.Ed.2d 41: (1966). We recognize, however, that th: cases in this and some other circuits ar: somewhat in disarray over the question *Compare, e. g., A. L. B. Theatre Corp. v. Loew's Inc.,* 355 F.2d 495, 499 (7th Cir. 1966); and *McGowan v. C. I. R.,* 347 F.2d 728, 729 (7th Cir. 1965), with *John R. Thompson Co. v. United States,* 477 F.2d 164, 167 (7th Cir. 1973); and *Yorke v. Thomas Iseri Produce Co.,* 418 F.2d 811, 814 (7th Cir. 1969). *See generally* the able discussion by Judge Duniway in *Lundgren v. Freeman,* 307 F.2d 104, 113–15 (9th Cir. 1962); Comment, *Federal Rule of Civil Procedure 52(a) and the Scope of Appellate Fact Review: Has Application of the Clearly Erroneous Rule Been Clearly Erroneous?,* 52 St. John's Law Rev. 68 (1977); Annot., 11 A.L.R.Fed. 212 (1972); and 9 Wright and Miller, Federal Practice & Procedure § 2587 (1971). At the least, we say with conviction that while the force of the rule may be "less inhibiting" in situations where the findings are based on undisputed and/or documentary evidence, they are entitled to "some deference" and cannot be set aside unless the appellate court can "come to a definite and firm conviction that an error [was] committed in the findings . . .." *Mercantile Nat. Bank of Chicago v. Howmet,* 524 F.2d 1031, 1035 n. 3 (7th Cir. 1975), *cert. denied,* 424 U.S. 957, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976).

The main thrust of Gruss' argument is that the Bank acted in bad faith because it "had reason to know of the highly irregular and suspicious nature of the transaction . . ."; *i. e.,* that the Bank was on constructive notice; hence the findings of fact are clearly erroneous.

The Bank, relying on cases decided under the Negotiable Instruments Law, *e. g., State Bank of Benkleman v. Iowa-Des Moines National Bank & Trust Co.,* 223 Iowa 596, 273 N.W. 160 (1937), and *Merchants' National Bank v. Detroit Trust Co.,* 258 Mich. 526, 242 N.W. 739 (1932), argues that the test of notice is essentially one of good faith or honesty in fact. It asserts that nothing less than guilty knowledge or willful ignorance will suffice; that is, one may not be charged with notice merely because of negligence or knowledge of suspicious circumstances.

This commingling of the concepts of good faith and notice makes resolution of this case more difficult than need be. However, the confusion is perhaps understandable since predecessor statutes to the UCC defined notice in terms of good faith.[7]

■ Since the UCC defines the concepts of notice and good faith separately, the perpetuating of a rule that one who acts with knowledge sufficient to put him on notice is deemed to act in bad faith, only causes needless confusion. UCC § 1–201(25) provides that "[a] person has 'notice' of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice of notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists."[8]

Thus, it is clear that the Bank's definition is too restrictive as either actual or constructive notice will prevent one from obtaining the favored status of bona fide purchaser. *Miriani v. Rodman and Renshaw, Inc.,* 358 F.Supp. 1011, 1014 (N.D.Ill.1973).

■ We cannot satisfactorily determine whether, in view of the apparent confusion over the separate standards of notice and good faith, the District Court was aware that the UCC's concept of notice includes constructive notice based upon suspicious

---

7. See n. 6, *ante.*

8. While UCC § 8–304 specifies three situations in which one will be deemed to have constructive notice as a matter of law, "the listing is not exhaustive." To the contrary, the trier of fact "may determine" that the "suspicious characteristics of the transaction" constitute the "reason to know" necessary to establish notice. This is particularly true in the case of a "commercially sophisticated purchaser" such as a bank. UCC § 8–304, Comment 1.

circumstances.[9] Accordingly, the question becomes whether the District Court's findings of fact are under the Rule 52(a) test clearly erroneous or erroneous in law.

In support of an affirmative answer to the question, Gruss argues that the Bank was on notice because it dealt with Kane as Gray's agent knowing that Kane was a suspected embezzler of its funds. In support of this contention, Gruss relies on *Bergheim v. McRae,* 190 Minn. 571, 252 N.W. 833 (1934), decided under Minnesota's Negotiable Instruments Law. Simons, one of the defendants, appealed the trial court's finding that he was not a bona fide purchaser when he took a note and mortgage as collateral for a loan knowing that his transferor was charged with embezzling bank funds and that he was trying to forestall criminal prosecution by borrowing money from Simons to make restitution. *Bergheim* is inapposite for two reasons. First, the appellate court merely held that the evidence was sufficient to support the finding that Simons was not a bona fide purchaser. It did not hold that the evidence compelled such a finding. Second, in *Bergheim,* Simons was held to be on notice that his transferor had obtained the collateral unlawfully. Here, Gruss argues that Gray rather than Kane was the culprit. Kane's transgressions do not make Gray's actions suspect. And unlike in *Bergheim,* there was no reason for the bank to suspect that Kane had bilked his transferor.[10]

Properly construed, the bulk of Gruss' argument that the Bank is not a bona fide purchaser is focused upon whether the Bank was on notice; however, it does cite factors in the record which do call the Bank's good faith into question. "Good faith" is defined for purposes of UCC § 8–302 in UCC § 1–201(19) as "honesty in fact in the conduct or transaction concerned." Thus, the question is a narrow one focused only on the subjective intent with which the purchaser acted. *Miriani,* 358 F.Supp. at 1013. See 1 Anderson, Uniform Commercial Code § 1–201:59, 60, 62 (2d ed. 1971). Certainly, as Gruss argues, the Bank had a motive to accept the Treasury Bills regardless of the legitimacy of the transaction. They were, after all, being submitted in repayment of an unauthorized and overdue loan. The Bank's subjective intent was further subject to question when it, no more than eight weeks prior to its acceptance of the Treasury Bills, refused to accept securities from Gray for redemption.

We have perused the entire undisputed and documentary evidentiary record with the reasonable inferences flowing therefrom and are inclined to the view that the Bank had constructive notice that something was wrong and had not proven by a preponderance of the evidence that it was entitled to the protected status of a bona fide purchaser of the Treasury Bills. However, such a finding is neither our task nor prerogative because, for the reasons stated, we are unable to "come to a definite and firm conviction that error [was] committed in the" District Court's findings of the pertinent facts.

II. *Burden of Proof:*

▮ We now meet Gruss' contention that the District Court's decision must be reversed because it erroneously placed upon Gruss the burden of proof or persuasion (i. e., production of a preponderance of the evidence that the Bank [11] was not a bona

---

9. Gruss' contention that the District Court was compelled to find that the Bank was on notice because it took the Treasury Bills a few weeks after maturity is without merit.

    UCC § 8–305 provides that, standing alone, the maturity of the obligation underlying a security does not constitute notice unless more than six months has passed prior to its acquisition. *See Phoenix Ins. Co.,* 366 F.Supp. at 343.

10. Gruss also complains that the circumstances under which Gray opened and maintained his account with the Bank were sufficient to con-stitute notice. However, it is not claimed that any of the factors specified were unlawful and/or related to securities transactions.

11. The Bank's argument that Gruss should be barred from raising this issue on appeal because it failed to raise it below is without merit. A review of the record shows that Gruss raised the burden of proof issue in oral argument to the District Court and in its post trial brief.

fide purchaser) rather than upon the Bank to prove it was a bona fide purchaser. We are satisfied that the District Court wrongfully placed upon Gruss the burden of proving that the Bank was not a bona fide purchaser and such ruling unwarrantably influenced the District Court's ultimate findings of fact. We simply note that the cases are virtually unanimous in concluding that a party claiming the benefit of the status of a bona fide purchaser under Article 8 of the UCC, as does the Bank here, bears the burden of proving that he acted without notice and in good faith. *E. g., Gutekunst v. Continental Ins. Co.,* 486 F.2d 194, 195 (2d Cir. 1973); *Phoenix Ins. Co.,* 366 F.Supp. at 343; *Otten v. Marasco,* 235 F.Supp. 794 (S.D.N.Y.1964), *aff'd,* 353 F.2d 563 (2d Cir. 1965); *Strand v. Prince-Covey and Co.,* 534 P.2d 892, 894 (Utah 1975); *Hollywood National Bank v. International Business Machines,* 38 Cal.App.3d 607, 614, 113 Cal.Rptr. 494, 498 (1974); *Young v. Kaye,* 443 Pa. 335, 279 A.2d 759, 765–66 (1971); *Gwatney v. Allied Companies,* 238 Ark. 962, 385 S.W.2d 940, 943 (1965). *But see Fidelity and Casualty Co. of N. Y. v. Key Biscayne Bank,* 501 F.2d 1322, 1325 & n. 3 (5th Cir. 1974).

The District Court erred in the allocation and placement of the burden of proof among the parties on the issue of the Bank's claimed protective status of a bona fide purchaser. However, the wording of the District Court's findings of fact and conclusions of law leaves uncertain two major questions that must be resolved to reach our ultimate conclusion as to whether the District Court's error is harmless or reversible.

█ Question 1: It appears, and we add not conclusively, from the language of the District Court's findings and conclusions that demand was made of Gruss to prove by a preponderance of the evidence that the Bank and Kane did not have *actual* knowledge or notice of the taint on the Treasury Bills, *viz.,* ownership. The omission of any finding of fact concerning the element of constructive notice of a fact "when . . from all the facts and circumstances known [to a party] at the time in question [that person] has reason to know that it exists", UCC § 1–201(25)(c), is an insufficiency of a material finding of fact, if not reversible error in law.

█ Question 2: The wording of the District Court's findings and conclusions leaves uncertainty in our minds as to the full extent of the allocation to Gruss of the burden of proof on the Bank's claim of the protective status of a bona fide purchaser. If the burden on that issue was in fact considered by the District Court to have been on the Bank to first establish its prima facie status as a bona fide purchaser, and when the District Court stated Gruss had failed to meet its burden, it meant that Gruss had failed to rebut the Bank's prima facie case, no reversible error appears. If so and in spite of the extremely suspicious circumstances involving the handling of the securities and the relationships and other dealings between Choisser, Kane, and Gray, our conclusion that the findings of fact are not clearly erroneous is fortified. However, it may be that the District Court considered the burden of proof, *i. e.,* the burden of producing a preponderance of the evidence, and its attendant risks, not just the burden of persuasion in rebuttal to any prima facie case established by the Bank, to have rested upon Gruss. If so and the District Court found that the Bank prevailed as a bona fide purchaser only because Gruss had failed to establish by a preponderance of the evidence that the Bank acted with actual or constructive notice of taint on ownership or negotiability or in bad faith, the District Court committed reversible error of law. *See, e. g., Erving Paper Mills v. Hudson-Sharp Machine Co.,* 332 F.2d 674, 678–79 (7th Cir. 1964), *cert. denied,* 379 U.S. 946, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).[12]

---

12. Gruss alleged in its complaint that the Bank was not a bona fide purchaser of the Treasury Bills. The Bank in its answer merely denied the substance of that allegation without alleging its claimed protective status of a bona fide purchaser by way of an affirmative defense. Such form and substance of poor pleading does not cause the ultimate burden of proof and

We have indicated that there is a deficiency in the District Court's specifically enumerated findings of fact which prevents us from reaching a satisfactory conclusion as to the correctness of the District Court's conclusions of law. We have also indicated our uncertainty as to just how the District Court allocated and considered between the parties the burden of proof as to the Bank's claim of protective status as a bona fide purchaser. We are satisfied that the better and most expeditious solution is to remand the cause of Gruss' claim against the Bank to the District Court for its first opportunity to re-evaluate and reconsider the findings of fact and conclusions of law in light of the foregoing.

*Gruss' Claim Against Kane:*

The parties agree that since Kane functioned as Gray's agent in transferring the Treasury Bills to the Bank for redemption, his liability is governed by UCC § 8–318. That section provides that an agent who has received securities and disposed of them under instructions from his principal is not liable to the true owner in conversion unless he acted in bad faith.[13] Where the agent "is in the business of buying, selling or otherwise dealing with securities," good faith is expressly defined as including the "observance of reasonable commercial standards."

Since the District Court found that Kane was not in the business of buying, selling or otherwise dealing with securities, it must be assumed that in finding that Kane acted in good faith, the District Court merely weighed Kane's conduct against the reduced standard of honesty in fact. Kane, as the Bank's employee, was charged with handling all of the Bank's Treasury Bills. Further Kane testified that he was familiar with bearer instruments and had often participated in their redemption.

The District Court's finding that Kane was not "otherwise dealing with securities" is clearly erroneous. Rule 52(a). *See United States Fidelity & Guaranty Co. v. Royal National Bank of N. Y.,* 545 F.2d 1330, 1332–33 (2d Cir. 1976); *Morgan Guaranty Trust Co. of N. Y.,* 400 F.Supp. at 390 n. 11. Accordingly, Kane's conduct should have been weighed against the stricter requirement that he observe reasonable commercial standards in taking the Treasury Bills from Gray.

The cause of Gruss' claim against Kane must be remanded for the District Court's first consideration in accordance with the proper standard.

The District Court's findings of fact and conclusions of law on Gruss' claim against the Bank and Kane and the judgments thereon entered on February 6, 1976 are each vacated and the cause remanded to the District Court for reconsideration of the findings of fact and conclusions of law in light of this opinion and upon the present evidentiary record, as well as such further record as the District Court should properly direct.

Upon entry of reconsidered findings of fact, conclusions of law, and judgment thereon, a new appeal by either party may be taken by filing a new notice of appeal. The new appeal shall receive a new docket number and, upon motion or stipulation, the record and briefs in the present appeal will be transferred to the new appeal. Additional records in the new appeal will be considered a supplement.

Judgment Vacated And Remanded.

SWYGERT, Circuit Judge, dissenting.

After reviewing the evidence, the majority notes that they "are inclined to the view

---

persuasion on the issue to shift from the Bank to Gruss. The doctrine of invited error, if adopted by the District Court, which operates to penalize a "careless pleader [Gruss] by imposing upon him the burden of proving [his allegations] which he would normally not have to prove" is not looked upon with favor by the federal courts under the Federal Rules of Civil

Procedure. 1A Pt. 2 Moore's Federal Practice ¶ 0.314[3], at 3511 (2d ed. 1977).

**13.** As is the case for UCC § 8–302, for purposes of UCC § 8–318 good faith is defined in UCC § 1–201(19) as "honesty in fact in the conduct or transaction concerned."

that the Bank had constructive notice that something was wrong and had not proven by a preponderance of the evidence that it was entitled to the protected status of a bona fide purchaser of the Treasury Bills." The majority then correctly rules that the district court "wrongfully placed upon Gruss the burden of proving that the Bank was not a bona fide purchaser . . .." The majority also correctly rules that the district court erred in not measuring Kane's conduct as an agent for Gray according to the "stricter requirement [of UCC § 8–318] that he observe reasonable commercial standards in taking the Treasury Bills from Gray."

When the foregoing comment and rulings are considered in juxtaposition, I am at a loss to understand why the majority hesitates to hold that the record required findings that neither the Bank nor Kane acted in good faith. Applying an erroneous burden of proof (by placing the burden on Gruss rather than on the Bank and Kane), the district court concluded that the defendants had acted in good faith. In my opinion, the trial judge was clearly erroneous as to both his findings and conclusions. I believe he unfortunately disregarded a virtually uncontested evidentiary record revealing a transaction that was shockingly irregular.

The facts which relate to the question of good faith on the part of the Bank are as follows. To qualify as a bona fide purchaser, the Bank had to have acted in "good faith" when it redeemed the Treasury Bills and credited a portion of the proceeds of redemption to Gray's account in satisfaction of an overdue loan made by the Bank. Yet the Bank (1) had actual knowledge that Gray, the purported owner of the Bills, had opened an account at the Bank under an alias, had no residence or business address anywhere near the Bank, was a "big bettor" at the racetrack, was purportedly an FBI "stool pigeon," had accepted and not repaid an unauthorized loan from an officer of the Bank charged with embezzlement, and had produced no proof of ownership whatever with respect to the Bills; (2) had learned that the FBI suspected that Gray

had committed a federal crime; (3) had actual knowledge that Kane had been discharged as an officer of the Bank two months previously for embezzling in excess of $200,000 in bank funds, was under investigation by the FBI for such embezzlement, had personally made an unauthorized bank loan to Gray, and had previously embezzled in excess of $100,000 from the bank account maintained by Gray; (4) knew that the Treasury Bills were a few weeks overdue; and (5) made no inquiry of Gray or Kane regarding proof of ownership of the Bills and did not ask either of them to give any receipt for the Bills. Neither Gray nor Kane offered to give such a receipt.

The facts which relate to the question of good faith on the part of Kane are as follows. To prevail, Kane had to have acted in "good faith" and in accordance with "reasonable commercial standards." Yet he (1) knew that Gray (a) operated under aliases, (b) was in default to the Bank for money obtained under an unauthorized loan, (c) maintained an account with the Bank under an alias, and (d) had no business or residence address anywhere near the Bank; (2) accepted the Treasury Bills for the express purpose of using a portion of the proceeds of their redemption to satisfy the loan which he had personally made from bank funds to Gray while an officer of the Bank and after his embezzlement of bank funds; (3) made no inquiry whatsoever into Gray's ownership of the Bills; and (4) neither offered nor was asked to give a receipt for the Bills when they were delivered to him away from the Bank premises at an airport in another city.

These facts admit to but one conclusion: Neither the Bank nor Kane acted in good faith. The unusual and irregular circumstances surrounding the transaction plainly indicate that the defendants had at least constructive notice that Gray's purported ownership of the Treasury Bills was "tainted." Therefore their acts were not done in good faith as required by the Commercial Code.

I would reverse and direct the district court to enter judgment for the plaintiff in the appropriate amount.