## City of Shamokin v. West End National Bank of Scranton

*Sanford S. Marateck,* for plaintiff.
*Jack Hartman,* for defendant.

RANCK, *J.,* November 10, 1983—This case comes before us on the motion for summary judgment filed by defendant, West End National Bank of Shamokin (hereinafter bank). Plaintiff's complaint sets forth two causes of action in assumpsit arising out of the unauthorized redemption of certain Treasury Notes (hereinafter notes) belonging to the Police Pension and Retirement Fund of the City of Shamokin (hereinafter fund). The complaint avers that Robert S. Mattern, the City Controller and member of the Board of the Fund at the time of these occurrences, purchased the Notes for and on

behalf of the Fund and retained possession of the notes following their purchase. Mattern subsequently redeemed the Notes and failed to pay the proceeds thereof to the fund. The City of Shamokin (hereinafter Shamokin) contends that as a result of the Bank's previous dealings with Mattern, the bank did not act with due care when it accepted the notes for redemption. In its answer and new matter, the bank denied that Allen S. Grow, its President and member of its board of directors, or any other person affiliated with the bank, aided in redeeming the notes or received proceeds resulting from the redemption of the notes on behalf of the bank with the knowledge that the notes were the property of the fund. The bank contends that Mattern, as city controller and member of the board of the fund, had sole and exclusive authority over investments by and on behalf of the fund. The bank filed a complaint against Mattern as additional defendant, claiming that if in fact Shamokin proves the notes were redeemed and disposed of by Mattern as alleged, such action was taken by Mattern in his individual capacity, or in his capacity as City Controller, but not with the knowledge of the bank.

The factual background as established by discovery and agreed upon by Shamokin and the bank is as follows:

(1) Mattern purchased and held the Notes in his capacity as City Controller and member of the Board of the Fund.

(2) The notes were purchased and held in the form of bearer instruments.

(3) In his capacity as cashier of the bank, and in breach of his duties as a bank employee, Mattern conducted certain transactions with regard to various accounts of bank customers intending to misrepresent the true nature of the accounts.

(4) Grow required that Mattern cover any defalcations resulting to the customers' accounts from Mattern's acts or omissions in regard to said accounts.

(5) To partially satisfy the defalcations, Mattern redeemed through the Bank certain Treasury Notes, now alleged to have been the notes.

(6) The notes presented by Mattern for redemption were presented as bearer instruments, and were redeemed in the normal course of business in the banking industry.

(7) The notes were redeemed and paid by cashier's check through the Bank to Mattern.

(8) Mattern then gave Grow the cash proceeds from the notes in partial satisfaction of the defalcations resulting from Mattern's acts or omissions.

Procedurally, this case was initiated by a writ of summons in assumpsit issued January 13, 1982. Plaintiff filed its complaint on or about October 8, 1982. On December 3, 1982, a writ of summons in trespass and assumpsit was issued joining additional defendant, Robert S. Mattern. The answer and new matter of the bank was filed on December 7, 1982, and on December 20, 1982, the bank filed its complaint against additional defendant. On or about December 27, 1982, Plaintiff filed its reply to new matter. The motion of defendant West End National Bank for summary judgment was filed on April 22, 1983.

The bank's basis for its motion for summary judgment is that since the notes were redeemed in the normal course of business in the banking industry, the bank received the notes in good faith and without notice of any adverse claim on behalf of Shamokin. The bank, through its agents and officers, had no reason to believe that the notes presented by Mattern were actually the property of the

fund. Accordingly, no genuine issue of material fact exists, and the bank is entitled to summary judgment as a matter of law.

Conversely, Shamokin alleges that the bank, through its officers and agents, knew or should have known that the notes did not belong to Mattern as evidenced by its own collateral records as well as the bank's knowledge of Mattern's previous manipulations of various accounts at the bank. According to plaintiff, fact questions exist as to whether the bank had notice of the adverse claim or whether the notes were received in good faith, thereby precluding summary judgment as a matter of law.

A court may grant summary judgment when ". . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law . . . ." Pa.R.C.P. 1035 (b). A court may only grant summary judgment in cases which are free and clear from doubt and where there are no controlling issues of fact raised by the pleadings. Fraim v. Katz, 68 D. & C. 2d 567, 574 (1975).

"When ruling on a motion for summary judgment, a court must accept as true all well pleaded facts and consider any admissions of record, but must resolve any doubts as to the existence of a genuine issue of a material fact against the moving party (citations omitted). We must view the record in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences (citations omitted)." First Pennsylvania Bank, N.A. v. Triester, 251 Pa. Super. 372, 378, 380 A.2d 826 (1977). The burden is on Shamokin to show that a genuine issue of material fact exists. Shamokin does not, however, in order to have the motion for summary judgment denied,

have to prove the fact itself. First Pennsylvania Bank, N.A. v. Triester, supra at 378.

The writings involved in this action are securities in bearer form as defined in Article 8 of the Uniform Commercial Code (UCC). 13 Pa. C.S.A. §8102. Securities governed by Article 8 are negotiable instruments. 13 Pa. C.S.A. §8105. Writings, such as the notes in this case, which meet the requirements of both Article 8, Investment Securities, and Article 3, Commercial Paper, are governed by Article 8. 13 Pa. C.S.A. §8102; Oscar Gruss and Son v. First State Bank of Eldorado, 582 F.2d 424 (7th Cir., 1978); Morgan Guaranty Trust Co. of New York v. Third National Bank of Hampden County, 400 F. Supp. 383, 388 (D. Mass., 1975) affirmed 529 F. 2d 1141 (1st Cir., 1976). See also 12A P.S. §8-102, Comment.*

The bank contends that it was a bona fide purchaser of the Notes, 13 Pa. C.S.A. §8302, and that even though the notes were stolen, due to the Bank's being a bona fide purchaser, the notes were acquired "free of any adverse claim." 13 Pa. C.S.A. §8301 (b); 12A P.S. §8-301, Pennsylvania Bar Association Notes — 1953; Insurance Company of North America v. United States, 561 F. Supp. 106 (E.D. Pa., 1983).

---

* Pursuant to Act 1979, Nov. 1, P.L. 255, No. 86, effective January 1, 1980, as amended through Act No. 1982-335, the provisions of the Commercial Code were transferred from Purdon's Title 12A to Title 13 Pa. C.S.A. without effecting a change in the substantive law. Until a fully annotated Title 13 Pa. C.S.A. is published, reference is made to Purdon's Title 12A, Uniform Commercial Code, which contains the text of Pennsylvania Bar Association Notes, the Official Uniform Commercial Code Comments, as well as additional annotative materials.

A bona fide purchaser is defined as:

". . . a purchaser for value, in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank." 13 Pa. C.S.A. §8302.

A determination of whether a party should have bona fide purchaser status turns on the facts and is not a question of law. Oscar Gruss and Son v. First National Bank of Eldorado, supra at 430. As the party claiming itself to be a bona fide purchaser, the bank has the burden of proving each element required to claim that status. 13 Pa. C.S.A. §8105 (b)(4); 12A P.S. §8-105, Comment 3; Young v. Kayte, 443 Pa. 335, 279 A.2d 759, 765-766 (1971); Phoenix Insurance Company v. National Bank and Trust Co. of Central Pennsylvania, 366 F. Supp. 340, 343 (M.D. Pa., 1972) affirmed 485 F. 2d 681 (3d Cir., 1973); SEC v. Investors Security Corporation, 415 F. Supp. 745 (W.D. Pa., 1976). This must be proven by a preponderance of the evidence. 12A P.S. §8-105, Comment 1; 12A P.S. §3-307, Comment 3.

The elements required for attaining the status of a bona fide purchaser for value are: (1) a purchaser, (2) value, (3) good faith, (4) no notice of any adverse claim.

(1) A "purchaser" is one who takes an interest in property by a voluntary transaction including taking an instrument by negotiation. 13 Pa. C.S.A. §1201. The Notes herein involved were bearer instruments and as such were negotiated by delivery alone. 13 Pa. C.S.A. §8302; Insurance Company of North America v. United States, supra at 113; Boyd v. United States, 493 F. Supp. 529, 532 (W.D. Pa., 1980). The bank became a purchaser when it acquired the Notes from Mattern. Phoenix Insurance

Company v. National Bank and Trust Company, supra at 342.

(2) ". . . [A] person gives 'value' for rights if he acquires them . . . (b) as security for or in total or partial satisfaction of a pre-existing claim; or . . . (d) generally, in return for any consideration sufficient to support a simple contract." 13 Pa. C.S.A. §1201. The bank took the notes for value when it accepted them from Mattern as payment for the defalcations he caused to various accounts, and subsequently when the proceeds of the redeemed Notes were used for repayment to said accounts.

(3) Good faith is defined as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa. C.S.A. §1201. This definition focuses on the subjective intent with which the purchaser acted throughout the course of its transactions. Insurance Company of North America v. United States, supra at 113; Oscar Gruss and Son v. First State Bank of Eldorado, supra. But, requirements in addition to "honesty in fact" are required for "good faith" under other provisions of the Code. 12A P.S. §1-201, Comment 19.

According to 13 Pa. C.S.A. §8318,

"An agent or vailee who in good faith (including observance of reasonable commercial standards if he is in the business of buying, selling, or otherwise dealing with securities) has received securities and sold, pledged or delivered them according to the instructions of his principal is not liable for conversion or for participation in breach of fiduciary duty although the principal had no right to dispose of them."

We believe that since the bank is in the business of dealing with securities, the objective good faith standard of observing reasonable commercial standards should apply. Morgan Guaranty Trust Com-

pany of New York v. Third National Bank of Hampden County, supra at 390, footnote 11; Insurance Company of North America v. United States, supra at 113-114. Whether the bank deserved reasonable commercial standards when it dealt with the securities received from Mattern is a question of fact.

(4) A person has "notice" of a fact when he has actual knowledge of it or from all the facts and circumstances known to him at the time in question he has reason to know that it exists. 13 Pa. C.S.A. §1201.

"A person 'receives' a notice or notification when:

(1) it comes to his attention; or

(2) it is duly delivered . . . at any . . . place held out by him as the place for receipt of such communications.

Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information." 13 Pa. C.S.A. §1201.

Notice includes constructive notice as well as whether "failure to make further inquiry would indicate a deliberate desire on the part of a party (here, the Bank) to evade certain knowledge as a re-

sult of a belief or fear that the investigation would disclose a vice in the transaction." First National Bank of Blairstown v. Goldberg, 340 Pa. 337, 17 A.2d 377 (1941); Insurance Company of North America v. United States, supra at 111. Actual or constructive notice will prevent one from obtaining the status of a bona fide purchaser. Oscar Gruss and Son v. First State Bank of Eldorado, supra at 431.

"Suspicious circumstances of the transaction may give a purchaser (particularly a commercially sophisticated purchaser such as a broker) 'reason to know.' " 12A P.S. §8-304, Comment 1. The bank, by virtue of having had previous dealings with various securities and negotiable instruments, falls into the category of a commercially sophisticated broker.

A perusal of the record and application of the appropriate sections of the Commercial Code lead us to conclude that while the bank was a purchaser for value of the notes, factual issues remain as to whether the bank acted in good faith or had actual or constructive notice that Mattern was redeeming bearer bonds belonging to the fund. Accordingly, we are unable to grant summary judgment as a matter of law.

We look at some examples which indicate to us that fact questions exist with regard to whether the bank acted in good faith or without notice of any adverse claim. In August of 1978, for example, Allen Grow became aware of certain acts and omissions of the part of Mattern with regard to accounts of customers (Paragraph 8, plaintiff's complaint and defendant's answer to plaintiff's complaint). Grow told bank employees in September of 1978 to photocopy transactions conducted by Mattern while Grow was on vacation. Subsequently, in July of 1980, Robert Macalady wrote a letter to Don Miller, the National Bank Examiner, delineating "ques-

tionable deposits reimbursed by Robert S. Mattern from August, 1978, to February, 1980, and a list of questionable demand loans initiated by Mattern which the party in question knew nothing about.". Macalady stated that,

"At the time I wrote this letter we were aware Mr. Mattern had possibly embezzled some funds and at the time that this money was reimbursed we had no idea where the money was coming from."

The letter points to August, 1978, as the time when the questionable deposits began. August, 1978, is also when Grow discovered defalcations to the other accounts. When Mattern would give the notes to the cashier for redemption and have the redeemed proceeds paid through the bank back to Mattern, who would subsequently turn the proceeds over to Grow in order to satisfy the defalcations of various accounts listed in the letter of July 9, 1980, no inquiries were ever made of Mattern to ascertain the origin of the notes. The bank believed that Mattern had the personal wealth to own them.

It is true that the Bank had no actual knowledge of any adverse claim to the notes by the fund, nor did the notes contain any restrictive endorsement or statement to indicate they belonged to someone else. A fact issue exists as to whether the bank, knowing of Mattern's prior conduct, acted in good faith or had constructive notice of Shamokin's claim, and whether inquiries should have been made as to the origin of the notes. First National Bank of Blairstown v. Goldberg, supra.

Another question of good faith concerns the manner in which the Fund itself was handled. One of the assistant cashiers wrote a letter certifying the balance in the Fund as of December 31, 1979, even though the money was, in fact, not there. Grow alleged that he used his own money and proceeds

from two treasury bills to make up the amount in the Fund. The serial numbers of these two treasury bills used matched serial numbers on the list of treasury notes. Grow, however, never told representatives of the Fund that he was using his own money to make up for the missing amount.

"(Grow): . . . I was trying to protect our employees who gave a statement out that the account was there and it wasn't there. And (the assistant cashier who wrote the letter veryifying the amount in the Fund) and both of them should have been fired because they shouldn't have wrote (sic) the letter for him (Mattern) and in the second place she shouldn't have verified it. I was trying to protect employees and the public.

Q: Are they still employees of the bank?

A: Yes, they are . . . ."

A third example where the good faith of the Bank is at issue concerns the Bank's keeping Mattern as an advisor after he was fired in February of 1980. Mattern continued to have access to the Bank's offices and records.

"(Grow): A: They said he was in, yes, walking around in there and stuff. He took people in the office and did business with them. I know that.

Q: Did you as President make any attempt to stop that?

A: I told him to stop it. I said stay the hell out of here. I said you don't have any business here. Well, as soon as — He knew exactly when I was go'in.

Q: Did you instruct any of the bank employees that he shouldn't be allowed in?

A: Yes, they knew he shouldn't be allowed in.

Q: And in spite of your instructions they allowed him in?

A: He just came in and mosied around. He was still on as an advisor. In an advisory capacity . . . .

Q: In other words Mr. Mattern had the run of the bank while he was the cashier?

A: That's right.

Q: And even after he was no longer the cashier?

A: He come in and had things done which the ordinary teller couldn't have done, yes.

Q: With the knowledge of the President, and with the knowledge of the employees?

A: Oh, now, not with my knowledge. I was out when he came in most of the time.

Q: But you knew he was coming in?

A: Sure. I would tell him to stay out but I couldn't stand guard there."

There is no one factor in this case that determines whether the Bank had notice or acted in good faith with regard to its dealings with Mattern and the fund. Factual issues remain to be determined before the bank can attain bona fide purchaser status. We note, for example, the letter of July 9, 1980, dating the beginning of Mattern's "questionable conduct" to be around the same time that the bank became aware of defalcations caused by Mattern to other accounts; that Grow went to Mattern for monies to satisfy the questionable accounts; that the Bank had a motive to accept the notes regardless of their legitimacy (see Oscar Gruss and Son v. First State Bank of Eldorado, supra at 432); and that the bank had access to the serial numbers, amounts, due dates and other information relating to the notes belonging to the fund.

These issues must be resolved before the bank can receive the notes free of the claim of the fund.

We, therefore, enter the following

## ORDER

And now, November 10, 1983, after careful consideration of the written and oral arguments of

counsel, the motion for summary judgment of defendant, West End National Bank of Shamokin, is hereby denied.