Joseph S. BARAKAT, Plaintiff,

v.

SOUTH FORK OIL AND GAS COMPANY; and A.H. Walker & Company, Defendants.

A.H. WALKER & COMPANY, Cross-Claimant,

v.

SOUTH FORK OIL AND GAS COMPANY, Cross-Defendant.

Civ. No. C 84–0806A.

United States District Court, D. Utah, C.D.

Dec. 11, 1985.

Randy L. Dryer, Parsons, Behle & Latimer, Salt Lake City, Utah, for plaintiff.

Yocel Alonso, McNaughton, Alonso, Vanderlyn, Leufven & Cersonsky, Houston, Tex., for South Fork Oil & Gas.

Mark O. Van Wagoner, Van Wagoner & Stevens, Salt Lake City, Utah, for A.H. Walker & Co.

## MEMORANDUM OPINION AND ORDER IN LIEU OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALDON J. ANDERSON, Senior District Judge.

## INTRODUCTION

On August 19, 1985, Plaintiff Joseph S. Barakat ("Barakat") filed on Motion for Partial Summary Judgment on the issue of Defendant South Fork Oil and Gas Company's ("SF") liability for refusing to register a stock transfer. Oral argument on the motion was heard on September 3 and 13. On October 16, an evidentiary hearing occurred at which Fareed Joseph Paul Barakat ("Fred Barakat") and Joseph S. Barakat were sworn and testified. Counsel presented opening statements and final arguments at that time.

## FACTS

The undisputed facts show that prior to August 29, 1983, Barakat loaned $330,000 to Fares Stephen ("Stephen"). Stephen previously had advanced $150,000 to James Vickers ("Vickers") as an investment, borrowing the money from Mr. Rahme. Vickers had promised a return of $275,000 in 30 days. The return was not forthcoming, and Stephen began to feel pressure inasmuch as the interest on the Rahme money was $30,000 per month. Barakat agreed to "bail Stephen out" of his predicament. In return for the $330,000, Stephen gave Barakat a deed to a building in New York as well as the right to collect from Vickers.

In August 1983 Vickers showed Barakat a commitment letter for an $8,000,000 loan, indicating that he needed $208,000 to close the loan. On the 29th of that month, Barakat gave Vickers $208,000. Barakat was willing to advance the money because he thought a multi-million dollar deal was in the making. In return for the $208,000 and for Barakat's claims against Vickers resulting from the advancement of funds to Stephen, Vickers executed a promissory note for $710,000. (The $710,000 covered the $330,000 advanced to Stephen; the $208,000 advanced to Vickers; air fare of $2,000; and interest and profit of $170,000.) The note was secured by cattle, and Vickers agreed to make interest payments on a monthly basis commencing on October 1, 1983. Those payments were not forthcoming.

When Barakat tried to perfect his security interest in the cattle on November 30, 1983, Vickers told Barakat that a third party had a first lien on the cattle. As a result, the parties executed a new note for $710,000 on December 6, 1983. Vickers pledged as security 256,571 shares of South Fork stock, represented by certificate #12025. The certificate specified Vickers Land & Cattle, Inc. as the owner. Vickers as President of the corporation endorsed the certificate in blank, and his signature was guaranteed by a reputable bank. The certificate contained no restrictive endorsements and was signed by the party acting as SF's transfer agent on the date of issuance, November 23, 1983 (Colorado Stock Transfer Services). On December 6, the date of the pledge, the market value of the stock was approximately $3 per share. That same day, Barakat's escrow agent took possession of the certificate, with instructions to hold it until February 1, 1984, at which time it would be released to Barakat if the note was unpaid.

Beginning in late December 1983, SF's officers became concerned about previous stock transfers made by the Chairman of SF's Board, Donald Rodebaugh ("Rodebaugh"), including the transfer to Vickers. Rodebaugh resigned as Chairman soon thereafter. Sometime between January 1984 and February 8, 1984, Richard Plato, President of SF, advised either Barakat or his son and attorney, Fred Barakat, that there were irregularities surrounding the stock transfer to Vickers. On February 8, Rodebaugh executed an affidavit alleging that Vickers had converted the stock (he rescinded that affidavit in May of that year). As a result of Rodebaugh's affidavit, SF decided on March 23, 1984, that Vickers' certificate should be cancelled and the stock reissued to Fraser Island, the purported original owner of the stock.

Because Vickers did not pay off the $710,000 note, the stock certificate was released to Barakat in March 1984. Around early April, Fred Barakat phoned SF's then transfer agent, Walker, to request registration of transfer. Walker refused, but suggested that Fred make written demand. On April 16, 1984, Fred sent a letter to Walker demanding registration. Approximately one week later, Walker notified Fred that it would not register the transfer.

On June 7, 1984, Barakat filed suit in Texas against SF and Walker. The present action was commenced on September 11, 1984.

## DISCUSSION

### ISSUER'S DUTY TO REGISTER TRANSFER

The circumstances under which an issuer has a duty to register a transfer are set forth in Nev.Rev.Stat. § 104.8401 (1979). (Nevada law applies because SF was organized in Nevada.) That section provides that an issuer has a duty to register a transfer when all of the following circumstances are present:

1) the security is in registered form;

2) the security is presented to the issuer with a request to register transfer;

3) the security is endorsed by the appropriate person;

4) reasonable assurance is given that the endorsement is genuine and effective;

5) the issuer has no duty to inquire into adverse claims or has discharged any such duty;

6) any applicable law relating to the collection of taxes has been complied with; and

7) the transfer is in fact rightful or is to a bona fide purchaser.

The Court will consider the last requirement first inasmuch as it is dispositive of the present motion.

Barakat claims that he was a bona fide purchaser ("BFP") of the stock. A BFP is one who takes delivery of a security in registered form, for value, in good faith, and without notice of adverse claims. Nev. Rev.Stat. § 104.8302 (1979).

Good faith and notice of adverse claims are separate elements and will be discussed separately. Although some courts have blended the two, the better reasoning is that they are separate. In *Oscar Gruss & Son v. First State Bank of Eldorado*, 582 F.2d 424 (7th Cir.1978), the Seventh Circuit stated that "[s]ince the UCC defines the concepts of notice and good faith separately, the perpetuating of a rule that one who acts with knowledge sufficient to put him on notice is deemed to act in bad faith, only causes needless confusion." *Id.* at 431. The court explained that good faith is measured subjectively, while notice of adverse claims is measured objectively.

Good faith is defined in the Code as "honesty in fact in the conduct or transaction concerned." Nev.Rev.Stat. § 104.-1201(19) (1979). Courts have determined that bad faith is present when: 1) the purchaser has actual knowledge of an infirmity; or 2) the purchaser fails "to make further inquiries as part of a 'deliberate desire on [its] part to evade knowledge because of a belief or fear that investiga-tion would disclose a vice in the transaction.'" *Insurance Co. of North America v. United States*, 561 F.Supp. 106, 113 (E.D.Pa.1983), *quoting First National Bank of Blairstown v. Goldberg*, 340 Pa. 337, 17 A.2d 377 (1941). *See also Gutekunst v. Continental Ins. Co.*, 486 F.2d 194, 196 (2d Cir.1973) ("[I]t is not ignorance, but guilty knowledge or conduct that can be equated with guilty knowledge, that can rise to bad faith.")

This determination, as well as that of notice of adverse claims, is made as of the time of delivery. Delivery occurs when the purchaser or a person designated by him acquires possession of the security. Nev. Rev.Stat. § 104.8313 (1979). In this case, delivery occurred when the escrow agent designated by Barakat took possession of the stock certificate on December 6, 1983.

At that time, Barakats had not yet been told about the alleged irregularities regarding the stock transfer. However, a factual dispute exists as to whether they were deliberately avoiding the discovery of such knowledge. Fred Barakat carefully checked the stock certificate to be sure that it was in proper form. Yet, despite the fact that prior collateral had failed, he did not make a similar investigation as to whether Vickers actually owned the stock. This at least raises a question of whether Barakats engaged in a studied refusal to acquire knowledge as to the propriety of the stock transaction.

Furthermore, a dispute also exists as to whether Barakat had notice of adverse claims. Notice of adverse claims includes both actual notice and constructive notice. *Gruss*, 582 F.2d 424. As stated in Nev.Rev. Stat. § 104.1201(25) (1979), "A person had [constructive] 'notice' of a fact when: ... [f]rom all the facts and circumstances known to him at the time in question he has reason to know that it exists." The presence of " 'suspicious characteristics of the transaction' constitute[s] the 'reason to

know' necessary to establish notice."
*Gruss*, 582 F.2d at 431 n. 8.

■ In order for suspicious circumstances to create in the purchaser a "reason to know", those suspicious circumstances must relate to the *stock* transaction or appear on the face of the security. Such has been the case where courts have found "reason to know" at the summary judgment stage. In *Dean Witter & Co., Inc. v. Educational Computer Corp.*, 369 F.Supp. 757 (E.D.Pa.1974), for example, there was a restrictive legend on the face of the certificate. In addition, the transferor had requested that he be allowed to exchange the certificate for one which he previously had given to the purchaser, a highly unusual practice. Similarly, in *In re Legel Braswell Government Securities Corp.*, 695 F.2d 506 (11th Cir.1983), the delivery instructions accompanying the certificate indicated irregularities in the stock transfer. The purchaser also was aware of a restriction on re-registration of the stock.

■ In this case, a question exists as to whether the stock transaction was suspicious. Vickers was dealing for himself in pledging the stock[1], yet the stock was issued not to him individually, but to Vickers Land and Cattle Inc. Vickers gave Barakat no indication that the corporation had authorized him to use the stock certificate for personal gain.

Because factual disputes exist as to these issues, the Court need not consider the other elements of BFP status.

CONCLUSION

Material issues of fact as to good faith and notice of adverse claims preclude summary judgment.

Accordingly,

The Court HEREBY DENIES Plaintiff's Motion for Partial Summary Judgment on the issue of SF's liability for failure to register the transfer.

1. Although the promissory note listed both Vickers Land and Cattle Inc. and Vickers as debtors, the original note which it replaced only named

Vickers individually. There is no evidence that the transaction was designed to benefit the corporation.